# Appendix Tab A

1

1

2               IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                      - - - - -

4
STANLEY M. KACZMORSKI    )
5  and CARMEN CUPELLI,     )
                          )
6           Plaintiffs,    )
                          )
7           vs.           ) Civil Action
                          ) No. 12-1694
8  OFFICE OF CONTROLLER    )
   OF ALLEGHENY COUNTY,    )
9  and CHELSA WAGNER,      )
   Controller, in her      )
10 individual and official)
   capacities,            )
11                        )
            Defendants.    )
12                     - - - - -

13        VIDEOTAPE DEPOSITION OF CHELSA WAGNER

14                     - - - - -

15                 August 13, 2013

16                     - - - - -

17

18                    CERTIFIED COPY

19

20

21

22

23 REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
   WITHOUT AUTHORIZATION FROM THE CERTIFYING
24 AGENCY

25                     - - - - -

13

1                    C. Wagner - by Ms. Elzer

2          A.     You're speaking of my House employees?

3          Q.     Yes.

4          A.     Not campaign employees?

5          Q.     Right.

6          A.     Not as full-time campaign staff.

7     It's very typical that people volunteer, but

8     not on work time, nor not on I don't believe

9     anyone in my office took a leave of absence to

10    come over and work on the campaign.

11         Q.     Okay.  So you're saying there may

12    have been people who worked for you at the

13    House who volunteered for your campaign outside

14    of work time?

15         A.     Correct.

16         Q.     Okay.  Did you use any of the same

17    campaign staff for your House campaign and your

18    controller campaign?

19         A.     Well, J.J. Abbott came -- I hired

20    him prior to declaring or even contemplating my

21    run for county controller.  So he was hired by

22    me in, let me see -- campaign cycles typically

23    take a year --

24         Q.     Right.

25         A.     -- because you have the primary and

1              C. Wagner - by Ms. Elzer

2      the general.  When I hired J.J. Abbott, let me

3      see, it was in the summer.  It was in the

4      beginning of July 2010.  And so while I was not

5      at that time up for reelection for the House,

6      you have a lot of standard kind of organizing

7      tasks.  So I hired him basically to be a

8      campaign manager, though I was not up for

9      reelection.

10             So to answer your question, yes,

11     J.J. had worked for me while I was still the

12     only office would be State House and then

13     continued on once I started campaigning for

14     controller.

15     Q.    Okay.  Can you just briefly describe

16     what the controller does?

17     A.    Sure.  I would say the most succinct

18     way to describe it is you are the fiscal

19     watchdog for the taxpayers of Allegheny County.

20     Another way to describe it would be being the

21     chief fiscal officer for the county.

22     Q.    Do you have any background in

23     accounting, finance, anything like that?

24     A.    I mean, I have -- my major in

25     undergrad was public policy, so within that

15

1              C. Wagner - by Ms. Elzer

2      there's heavy coursework in economics.  I have

3      done policy consulting after my undergrad, so

4      it certainly incorporated aspects of public

5      administration, you know, which accounting and

6      finance certainly come into play.

7              After that, I worked as an attorney,

8      which is, you know, quite frankly, the same

9      background that all of my predecessors in

10     recent history in the Controller's Office, both

11     in the county and the city, were also attorneys.

12         Q.    Right.  So when did you graduate

13     from law school?

14         A.    2005.

15         Q.    Did you go to Pitt Law School?

16         A.    Yes.

17         Q.    Okay.  How long did you work as an

18     attorney?

19         A.    Not very long full time.  It was

20     about -- so I passed the Bar in October of

21     2005, and I worked as an attorney for I guess

22     just over a year before being sworn in to the

23     State House.

24              So there were times where when I

25     began I was working full time, but shortly

```
 1              C. Wagner - by Ms. Elzer
 2        Q.    Okay.  So are you still affiliated
 3   with Leech Tishman now?
 4        A.    Yes.  In an Of Counsel capacity.
 5        Q.    At Rosen Louik & Perry, do they do
 6   personal injury?
 7        A.    They do.
 8        Q.    Is that what you were doing when you
 9   were there?
10        A.    I was actually doing discovery work
11   to support -- they're a plaintiffs' firm, so it
12   would be anything from personal injury --
13   mainly personal injury or medical malpractice.
14   Largely medical malpractice.
15        Q.    You said you were at the Homyak Law
16   Firm before them?
17        A.    Correct.
18        Q.    What do they practice?
19        A.    Similar.  They are also a
20   plaintiffs' firm.  So any kind of plaintiffs'
21   suits were the types of things that I was
22   working on there.
23        Q.    Okay.  So before you took office,
24   the previous controller was Mark Patrick
25   Flaherty; is that right?
```

18

1                    C. Wagner - by Ms. Elzer

2          A.      Correct.

3          Q.      Okay.   After you were elected

4    controller but before you were sworn in, did

5    you meet some of the people who worked at

6    Mr. Flaherty's office?

7          A.      Yes.

8          Q.      Okay.   Did you meet with all the

9    employees?

10         A.      Not all of them, no.

11         Q.      Okay.   Did you meet with Stan

12   Kaczmorski?

13         A.      Yes, I did.

14         Q.      Did you meet with Carmen Cupelli?

15         A.      Yes, I did.

16         Q.      Okay.   How did you come to meet with

17   them?

18         A.      I had -- I believe the first meeting

19   that I had with them was in the course of

20   routine meetings that I was doing with

21   different employees, mainly focusing on what I

22   believe Mark considered to be his Administrative

23   Department.  So the folks that worked most

24   closely with Mark Flaherty.

25         Q.      Mr. Kaczmorski and Mr. Cupelli were

1            C. Wagner - by Ms. Elzer

2    in that meeting?

3          A.    They had individual meetings, but

4    they fell into that category of employees.

5          Q.    Okay.  So you met with them

6    individually?

7          A.    Correct.

8          Q.    Okay.  So Mr. Flaherty considered

9    both Mr. Kaczmorski and Mr. Cupelli to be

10   people that worked closely with him?

11         A.    Well, I mean, those are my words.

12         Q.    Right.

13         A.    But I think that's certainly

14   supported from conversations that I had with

15   Mark Flaherty, as well as the organizational

16   chart of the Controller's Office that was given

17   to me by Mark Flaherty, as well as job

18   descriptions from all of the employees also

19   given to me by Mark Flaherty.

20         Q.    Okay.  So you came and you met with

21   those what you characterize as administrative

22   employees individually?

23         A.    Yes.

24         Q.    Okay.  When was that about?

25         A.    Well, I had two individuals who did

20

1              C. Wagner - by Ms. Elzer

2    kind of preliminary information gathering for

3    me.  That was because I was still a member of

4    the State House.  It happened to be an active

5    time in terms of the way the House schedule

6    sort of ebbs and flows.

7              So, unfortunately, in terms of my

8    own time constraints, I had just won the

9    election for controller and had to basically do

10   planning, in terms of being able to have a

11   smooth transition to office; however, I wasn't

12   in Pittsburgh.  I was often in Harrisburg.

13             So my meetings with them were in the

14   November/December time frame.  Off the top of

15   my head I can't tell you the specific date.

16        Q.    Okay.  So you said you had

17   two individuals do some preliminary information

18   gathering before that?

19        A.    Correct.

20        Q.    Who were they?

21        A.    That's J.J. Abbott and Marty Schmotzer.

22        Q.    Did Marty Schmotzer work on your

23   campaign?

24        A.    He did, yes.

25        Q.    Okay.  What was his position with

21

1                C. Wagner - by Ms. Elzer

2    the campaign?

3         A.    He was considered a consultant.

4         Q.    So you had Mr. Schmotzer and

5    Mr. Abbott meet with these individuals.  I'm

6    going to show you a document.

7                MS. ELZER:  Can you mark that

8    as Exhibit 1.

9                (Wagner Exhibit No. 1 was

10   marked for identification.)

11        Q.    Okay.  You can take as long as you

12   need to take a look at this.  Just let me know.

13   My question is going to be have you seen this

14   document before?

15        A.    Yes.  I don't need time.  But, yes,

16   I have.

17        Q.    Okay.  What is this document?

18        A.    These were notes that were prepared

19   by J.J. Abbott.  It was pretty much a kind of

20   running working document based on information

21   that he and Marty collected from their one-on-

22   one interviews.  So though separate from this

23   document we collected a lot of different

24   information, this was specifically limited to

25   information that was given by each respective

1              C. Wagner - by Ms. Elzer

2     said, I was in Harrisburg, so I believe we

3     utilized Google documents.  So at any point in

4     time when J.J. was putting information into the

5     document, I would be able to in realtime look

6     at the document and see what was there.  So I

7     had certainly reviewed this on an ongoing basis.

8              Q.    All right.  When you met with

9     Mr. Kaczmorski, which you said it would have

10    been November/December of 2011?

11             A.    Correct.

12             Q.    Was anybody else present?

13             A.    I believe it was just Ira Weiss when

14    I met with him.

15             Q.    And Ira Weiss was your attorney; is

16    that correct?

17             A.    He is a solicitor for the

18    Controller's Office.

19             Q.    Okay.  Was he already a solicitor

20    for the Controller's Office before you took

21    office?

22             A.    No, he was not.

23             Q.    So did you hire him, then, as a

24    solicitor?

25             A.    Right.  Upon taking office, yes.

1          C. Wagner - by Ms. Elzer

2          Q.     So you and Mr. Weiss met with

3    Mr. Kaczmorski?

4          A.     Correct.

5          Q.     Okay.  What do you remember about

6    that meeting?

7          A.     I'm not going to look at this

8    because this was not my meeting.

9          Q.     Right.  Okay.

10         A.     So, I mean, my recollection was that

11   it was brief.  The way that I approached all of

12   those meetings was, you know, telling the

13   respective employees that I wanted them to

14   share information with me.

15              I was never approaching this

16   transition period in a presumptuous manner.  So

17   it was really open-ended, if they could give me

18   more insight into what they do.  And also, I

19   mean, it was, to me, if somebody wanted to say

20   something that they wanted to be confidential,

21   that was fine too, because I was trying to

22   gather information about their respective role

23   in the Controller's Office, as well as the

24   overall workings of the office itself.  So

25   everyone had different insight.

25

1                    C. Wagner - by Ms. Elzer

2          Q.    So when you met with Mr. Kaczmorski,

3    you said it was brief.  Approximately how long

4    are you talking about?

5          A.    I mean, this was now almost two years

6    ago, so I don't recall specifically, but I

7    would approximate about 15 minutes.

8          Q.    Did you take any notes during that

9    meeting?

10         A.    I am not sure that I specifically

11   did.  I, you know, would have a notepad, like I

12   do now.  And I wouldn't take notes with the

13   employees just to take notes.  What I would do,

14   however, if there was something that I had not --

15   I mean, I can't generalize everything that I

16   would take down in notes, but usually things

17   that struck me in a way that I hadn't known of

18   or learned of before, or I just wanted --

19              You know, say a specific program in

20   the Controller's Office, if I hadn't heard of

21   that before or didn't know of it, I might take

22   a note on that.

23         Q.    Okay.

24         A.    I don't recall specifically if I

25   took notes during that meeting but have

30

1              C. Wagner - by Ms. Elzer
2     necessarily going to disagree that, if you look
3     at Bullet 1, Mr. Kaczmorski said that he
4     started in February 2004, retired from Heinz
5     the year before.  That's information that
6     doesn't call for either of them to provide a
7     subjective opinion.
8              However, where you see the bullet
9     that says "JA/," any time that either of them
10    were offering their subjective opinion, I asked
11    them to label it with their initials.
12         Q.    Okay.  So where it says "JA" on the
13    last bullet point on Page 5, he says "seemed to
14    have a lot of ideas for initiatives for the
15    Controller's office -- did little describing of
16    work as TAW manager."
17         A.    Uh-huh.
18         Q.    Did you agree with those assessments
19    when you met with Mr. Kaczmorski?
20         A.    When -- those assessments, could
21    you --
22         Q.    The first assessment it sounds like
23    he made is seemed to have a lot of ideas for
24    initiatives for Controller's Office.  When you
25    met with Mr. Kaczmorski, did he seem to have a

31

```
 1              C. Wagner - by Ms. Elzer
 2    lot of ideas for the Controller's Office?
 3         A.    No.  Not in my opinion.
 4         Q.    Okay.  Did you talk about ideas for
 5    initiatives?
 6         A.    I mean, that was the opportunity
 7    that everybody was given.  So I know that I
 8    explicitly stated in that interview, I want to
 9    hear your thoughts, I want to hear your ideas,
10    I want to hear what you do.
11              Some people, you know -- I can give
12    you an example of one employee, John Duch, if I
13    pronounced his name correctly, who is on here,
14    and I haven't reviewed this just prior to this.
15    But I can tell you the interview with John Duch
16    went on for about an hour because that was just
17    very, very substantive in terms of work and in
18    terms of ideas about what goes on there.
19              So when I asked that question open-
20    ended, there were some instances where we got a
21    lot of information and some instances where we
22    got very little.
23         Q.    When you met with Mr. Kaczmorski, it
24    was more on the end of very little information?
25         A.    Yes.
```

1                    C. Wagner - by Ms. Elzer

2          Q.     Okay.  Do you remember anything

3    specific that you discussed with Mr. Kaczmorski

4    regarding ideas for initiatives for the

5    Controller's Office?

6          A.     I recall him speaking to his duties,

7    but, I mean, nothing -- if you're saying ideas

8    for initiatives, I don't recall specifically, no.

9          Q.     Okay.  All right.  The other part of

10   what Mr. Abbott has written is that

11   Mr. Kaczmorski "did little describing of work

12   as TAW Manager - many of these units (Asset

13   Management, W&M, Tax Lien) seem self-sustaining

14   with good managers, Stan's duties directly

15   related to position were not spoken of in much

16   detail - even when asked specifically."  Did

17   you form the same impression when you met

18   Mr. Kaczmorski?

19         A.     So I did.  Because when I would have

20   a note like that in front of me, that would

21   tell me that that was a question that I

22   specifically wanted to ask for follow-up.

23               So, you know, I can't recall, you

24   know, the 15 minutes of that interview, but I

25   know that when I look at this document, the way

33

C. Wagner - by Ms. Elzer

1
2       that I approach things -- the way that I
3       approach things were that if there was anything
4       in here that was not answered sufficiently,
5       that was a question for which I would follow up.
6               Q.    So do you remember, then, asking
7       Mr. Kaczmorski what his duties were?
8               A.    I do, yes.
9               Q.    Okay.  Do you remember how he
10      responded to that?
11              A.    I do not recall his answer verbatim,
12      but I recall it being consistent with some of
13      J.J.'s notes, in that I did not get much
14      explanation in terms of the duties of the
15      so-called TAW manager.
16              Q.    And TAW stands for what?  Tax liens --
17              A.    Tax Liens --
18              Q.    Asset --
19              A.    Asset Management and Weights &
20      Measures.
21              Q.    So you didn't -- after you met with
22      Mr. Kaczmorski, you did not get a sense of what
23      that position did?
24              A.    No.  I would not say that I did not
25      get a sense of what that position did, I did

34

```
 1              C. Wagner - by Ms. Elzer
 2    not get the sense that what he did on a
 3    day-to-day basis was, I mean, it was not
 4    specific to that position.
 5         Q.    Okay.  Did you review the job
 6    description of the TAW manager?
 7         A.    Yes, I did.
 8         Q.    Okay.  I'll show you that, what
 9    we'll mark that as Exhibit 2.
10                   (Wagner Exhibit No. 2 was
11    marked for identification.)
12         Q.    Okay.  Have you seen this document
13    before?
14         A.    Yes, I have.
15         Q.    Okay.  This is the job description
16    for the TAW manager?
17         A.    Yes.
18         Q.    Okay.  When did you review this?
19         A.    I would say roughly it was within
20    that same time frame, November/December.  This
21    was provided to me by Mark Flaherty and his
22    deputy, Guy Tumolo; however, there were delays
23    in me receiving this.  And my understanding of
24    that was that the respective employees were
25    still working on these documents.
```

35

1                    C. Wagner - by Ms. Elzer

2          Q.     Okay.  So you see there's an

3     original date of May 8, 2011, there?

4          A.     Correct.

5          Q.     Okay.  But your understanding is

6     that the document hadn't been completed by the

7     November/December time frame?

8          A.     This says original date May 8, 2011,

9     I mean, I don't think I saw anything like this

10    until the November time frame.

11         Q.     Okay.

12         A.     So I don't have knowledge as to

13    whether this was in fact started on the

14    original date.  All I know of that, that they

15    were given to me in the November/December time

16    frame and that there were delays, because this

17    was part of the binder which we were provided,

18    that was basically a replica, though updated,

19    of the provider that Mark Flaherty received

20    from Dan Onorato when he took office eight years

21    prior.

22                So I actually had the copy of that

23    binder from Dan Onorato sooner than I had the

24    updated copy because it was still a work in

25    progress.

36

                    C. Wagner - by Ms. Elzer

1

2        Q.     Okay.  We'll get to this in more

3    substance later, but at some point you decided

4    to eliminate some positions; correct?

5        A.     That's correct.

6        Q.     One of the positions you eliminated

7    was the TAW manager position?

8        A.     Correct.

9        Q.     Had you reviewed this job

10   description before you decided to eliminate the

11   position?

12       A.     Yes.  Before I ultimately decided on --

13   I mean, things that I was figuring out were --

14   part of the review for those decisions were the

15   job descriptions; were the interviews; you

16   know, the Administrative Code.  I mean, it was

17   really taking all of the information, including

18   the job descriptions.

19       Q.     During your meeting with

20   Mr. Kaczmorski, do you recall telling him that

21   you were very loyal to your people?

22       A.     No.

23       Q.     Okay.  Do you recall ever making

24   that statement?

25       A.     No.  And my, you know, what I would

```
 1              C. Wagner - by Ms. Elzer
 2   gather is that's a rather gross mischaracterization
 3   of a conversation.
 4        Q.    Do you recall a conversation -- let
 5   me ask it this way.  Saying it's a gross
 6   mischaracterization, do you remember a
 7   conversation that something like that was said?
 8        A.    No.  What I indicated was that --
 9   this was a very short exchange, short being
10   15 minutes or thereabouts.
11        Q.    Right.
12        A.    I would start off all of these
13   interviews or meetings in the same way, in that
14   I would indicate to the respective individuals
15   that, you know, this was an opportunity for
16   them to describe what they do, give me
17   information, ask me questions if they had
18   questions of me.  But I also did say to them
19   I'm in the process -- you know, I think it's
20   always fair to give people information about
21   what you're doing in a meeting.
22              So, you know, even today if I call
23   somebody up and say, I would like to meet with
24   you, I just don't kind of blind-side them.  So
25   what I would say in the meetings is that I am
```

1            C. Wagner - by Ms. Elzer

2    reviewing the organizational structure and

3    working to see the management structure,

4    overall structure, employment practices, so on

5    and so forth, that will best suit my

6    administration in the Controller's Office.

7          I know that I did say that there

8    were different people that would be meeting

9    with them and that there were people who had

10   worked with me in the State House, some for

11   five years, and they were people that would

12   likely be coming on with me, and that those

13   people had proven themselves in terms of their

14   work history to me, so that they were folks

15   that were important to me.

16      Q.    Okay. So you would have said

17   something along those lines to Mr. Kaczmorski

18   when you met with him?

19      A.    Correct.

20      Q.    All right. Do you recall meeting

21   with Carmen Cupelli in the November/December

22   time frame?

23      A.    Yes, I do.

24      Q.    Do you recall anything about that

25   meeting?

39

1                   C. Wagner - by Ms. Elzer

2          A.    I do.  I recall Mr. Cupelli seeming,

3    you know, somewhat nervous, you know, just in

4    terms of personal observations in the meetings.

5    I also recall him referring, you know, when I

6    would ask about his job duties, referring to

7    his own notes that he brought to the meeting.

8          Q.    Okay.  So when you say that you

9    could tell he was nervous, what did he do that

10   led you to believe that he was nervous?

11         A.    I mean, again, this was two years

12   ago.  I know that was my impression.  You know,

13   whether it was somebody shifting in their

14   chair.  I know that was my impression.

15               I don't think he had clear answers,

16   like I said, when I asked those standard

17   questions as to what somebody's responsibilities

18   were but instead was looking at a paper.  You

19   know, he may have been -- of course, everybody

20   has different mannerisms when they are nervous.

21   You know, I don't recall specifically if his

22   hands were shaking, but he exhibited

23   characteristics that I would classify as

24   nervous behavior.

25         Q.    Okay.  You just don't remember

40

1               C. Wagner - by Ms. Elzer

2    specifically what those were?

3         A.    The one that was clear to me was not

4    being able to give answers and looking down at

5    a piece of paper.  Delays, that sort of thing.

6         Q.    Okay.  So the paper that he looked

7    at, did it appear to be handwritten notes?

8         A.    I don't recall.

9         Q.    Okay.  About how long did you meet

10   with Mr. Cupelli?

11        A.    My recollection is roughly the same

12   amount of time, about 15 minutes.

13        Q.    Okay.  Do you remember anything that

14   was discussed during that meeting?

15        A.    Again, that I -- things that, you

16   know, that stick out to me more with any of the

17   employees with whom I met are the things that,

18   you know, may be slightly unique.

19              And one of the statements that he

20   made that most certainly was not solicited and

21   was not how I basically -- what I cared to hear

22   for or how I conducted any of these meetings,

23   you know, he told me, you know, that he would

24   be happy to help me in any way.  I forget if he

25   said specifically campaign, but that was

1                C. Wagner - by Ms. Elzer

2     certainly what the reference was, that he would

3     be happy to help me on campaigns and be helpful

4     to me.

5          Q.    Okay.  Now, you had already been

6     elected at this point; correct?

7          A.    Correct.

8          Q.    Okay.  But you understood him to be

9     saying that he would help you campaign in the

10    future?

11         A.    Right.

12         Q.    Okay.  Do you remember anything else

13    he said?

14         A.    Not specifically.  But, again, it

15    was consistent with, you know, what I had

16    gathered, you know, from the meeting, the

17    preliminary meeting, that J.J. and Marty had

18    with him, and then also other information that

19    I reviewed; and, you know, all of the other

20    sorts of meetings that I had with folks in the

21    Controller's Office such as Mark, Guy, and so

22    forth.

23         Q.    So you met with Mark Flaherty and

24    Guy Tumolo.  Did you discuss Mr. Cupelli's job

25    duties during these meetings?

42

1                    C. Wagner - by Ms. Elzer

2          A.     Yes.  They were discussed.

3          Q.     Okay.  What did they say?

4          A.     Guy said, and I am, you know, not

5      quoting him verbatim, but Guy told me that

6      there was no, you know, specific thing that he

7      was doing or that wasn't adding value to the

8      office.

9          Q.     That's what Mr. Tumolo told you?

10         A.     Correct.

11         Q.     Did Mr. Flaherty say anything like

12     that?

13         A.     No.  Mr. Flaherty's depiction was

14     very different.  And I recall a specific

15     meeting that Mark and I had where Mark

16     described Mr. Cupelli as doing, I mean, I would

17     describe it as every task under the sun, but

18     many of them not being specific to that office.

19     So Mark described him as an indispensable

20     employee.

21         Q.     Did he explain what kind of tasks

22     that he did?

23         A.     Not well.  So, like I said, he made

24     it sound like it was a laundry list of

25     different tasks, in the same way that you'll

43

1               C. Wagner - by Ms. Elzer

2     look at a job description or other.  But when

3     you talk about, for example, this tax lien

4     business, that was not a task that was specific

5     to the Controller's office.

6               So though he attempted to describe

7     what he did, I mean, you being an attorney, you

8     certainly know the difference when you're

9     hearing something that has backing and

10    documentation or something that really just

11    doesn't add up.  It didn't add up.

12         Q.   Okay.  When you talk about the tax

13    lien business not being specific to the

14    Controller's office --

15         A.   Correct.

16         Q.   -- was that shared with another row

17    office?

18         A.   Well, the primary responsibility for

19    oversight of tax liens is the Treasurer's office.

20         Q.   Okay.  Was that something that you

21    understood the Controller's office to also have

22    responsibility over?

23         A.   No.

24         Q.   Okay.

25         A.   Not specifically.  I mean, there's

44

C. Wagner - by Ms. Elzer

1

2       some -- there's some duplicative work that has

3       historically been done in the Controller's

4       Office.  But, you know, duplication of what one

5       office is doing in the Controller's Office or

6       any other, you know, it's not an efficient way

7       of handling government.

8           Q.    So when you say the tax lien was the

9       primary responsibility of the Treasurer's

10      Office, is that statutory, if you know?

11          A.    I believe it may be, but I don't

12      recall specifically.  I know it's not

13      statutorily a, you know, substantive function

14      of the Controller's Office.

15          Q.    Okay.  And you had the understanding

16      that it was a function of the Treasurer's Office?

17          A.    I believe so, yes.

18          Q.    Okay.  So you said you had talked to

19      Mr. Flaherty and Mr. Tumolo about Carmen

20      Cupelli and his job duties.

21          A.    Uh-huh.

22          Q.    Did you have a similar conversation

23      regarding Mr. Kaczmorski?

24          A.    Nothing sticks out specifically.

25      You know, I believe -- well, I know Guy Tumolo

45

                    C. Wagner - by Ms. Elzer

1

2      advocated for Mr. Kaczmorski.  Other folks

3      approached me, including my own aunt, who,

4      quite frankly, has been my biggest supporter

5      ever in politics, Eileen.  It was one of the

6      things that she said to me very early, that she

7      had a very good friend in the Controller's

8      Office, Mr. Kaczmorski, and asked that I keep

9      him on staff.

10                   Then also Bill Pietragallo, who has

11     been a long campaign supporter of mine.  I had

12     him as a professor in law school.  He was

13     actually one of the first people to ever

14     contribute to one of my campaigns.  So he also

15     asked me to keep Mr. Kaczmorski on.

16          Q.    And your aunt is Eileen Wagner?

17          A.    Correct.

18          Q.    And she knew Mr. Kaczmorski somehow?

19          A.    Correct.

20          Q.    Okay.  When these people advocated

21     for Mr. Kaczmorski, did they say why?

22          A.    No.

23          Q.    Okay.  They wouldn't have known,

24     like, about the job that he performed?

25          A.    I can't speak to that.

52

C. Wagner - by Ms. Elzer

2  Monday to Wednesday, so I believe I probably

3  spoke with him around that date.  And, I mean,

4  Marty just said that it was a good interview,

5  and that in an odd sense they figured out that

6  they both had some connection to the South Side

7  and how they were related and figured that out

8  in the interview.

9      Q.    Okay.  So on Exhibit 1 we also have

10  the interview of Mr. Cupelli, which I guess his

11  name is at the bottom of Page 3 and the

12  substance is on Page 4, which looks like

13  Mr. Abbott and Mr. Schmotzer met with Mr. Cupelli

14  the same day they met with Mr. Kaczmorski,

15  according to these documents.

16          So when you talked to Mr. Schmotzer

17  about Mr. Kaczmorski and about how he was his

18  cousin, did he mention Mr. Cupelli during that

19  conversation as well?

20      A.    I believe, but I don't have any

21  specific recollection of that conversation.

22      Q.    Okay.  So you don't remember

23  anything about that?

24      A.    No.

25      Q.    Okay.  Reading what has been written

53

1                       C. Wagner - by Ms. Elzer

2        about Mr. Cupelli on Exhibit 1, was that

3        consistent with your meeting and the

4        information you got from Mr. Cupelli?

5                A.      Yes, I believe so.

6                Q.      Did you review Mr. Cupelli's job

7        description at any point?

8                A.      Yes.

9                Q.      I'll show you that.

10                       MS. ELZER:  This will be

11       Deposition Exhibit 3.

12                       (Wagner Exhibit No. 3 was

13       marked for identification.)

14                Q.      Have you seen this document before?

15                A.      Yes, I have.

16                Q.      Do you understand this to be the job

17       description for Mr. Cupelli?

18                A.      Yes, I do.

19                Q.      Okay.  Did you see this document at

20       the same time that you saw Mr. Kaczmorski's job

21       description that you were talking about earlier?

22                A.      In all likelihood, yes.

23                Q.      Okay.  So it was in that same binder

24       that you were talking about?

25                A.      Correct.

54

1          C. Wagner - by Ms. Elzer

2          Q.     In reviewing this document, did you

3    get a better sense of what Mr. Cupelli did at

4    the Controller's Office?

5          A.     Could you repeat the question?

6          Q.     When you reviewed Exhibit 3,

7    Mr. Cupelli's job description, did you get a

8    better sense of what he did at the Controller's

9    Office?

10         A.     I would answer that no, because it

11   did not, you know, really seem to be

12   substantive work, what I would consider to be

13   substantive work.

14         Q.     Okay.  So the first duty listed here

15   is investigates all requests from Allegheny

16   County taxpayers related to property

17   assessments.  Is that something anybody does at

18   the Controller's Office now?

19         A.     No.  I can tell you that I have been

20   in office for over a year and a half, and we

21   have had no need whatsoever for anybody to,

22   what this says, investigate a request from

23   taxpayers related to property assessments.

24              I have done an audit, but that's the

25   specific work that has been done within our

1              C. Wagner - by Ms. Elzer

2    Audit Division.  In terms of the -- I mean,

3    it's summarized in reports from our office.  We

4    have done what I guess I would consider to be a

5    three-part audit on the property assessment

6    system, which is, of course, one of the biggest

7    hot-button issues for county residents.  So

8    it's been a focus of our audit work, but it is

9    not a function as described here.

10        Q.    Okay.  When you did the audit, who

11   assists you with the audit, if anyone?

12              MR. GLEASON:  I'm sorry.  I

13   couldn't understand the last line.

14        Q.    Who assists you with the audit?

15        A.    Our Audit Division, which is headed

16   by Lori Churilla.

17        Q.    Do you have an understanding of

18   where taxpayers are supposed to inquire about

19   property assessments?

20        A.    The Office of Property Assessment.

21        Q.    So, in your understanding, they

22   shouldn't be calling the Controller's Office?

23        A.    I never turn anybody away from our

24   office.  I mean, that has been a philosophy of

25   mine in the State House.  I believe that all

56

1    C. Wagner - by Ms. Elzer

2 government officials should not add to the red

3 tape but should basically provide assistance

4 where they can.

5    So what that would mean in the

6 day-to-day course of business, say somebody

7 calls and doesn't know where to go for -- has a

8 question related to their garbage being taken

9 out or a street being plowed.  I wouldn't

10 instruct my employees to hang up the phone and

11 say, that's not our problem, call such and such

12 office.  I would ask them to make sure that we

13 acted as a liaison, got the folks in touch with

14 the respective programs.

15    So no one would be hanging up the

16 phone if somebody called our office asking

17 about any subject.

18   Q. Okay.  So are you aware of people

19 calling with questions about property assessments?

20   A. It certainly happened during the

21 course of the audit.  You know, I sign letters --

22 I mean, I would categorize these as sort of

23 like a constituent, a day-to-day constituent

24 activity, which is language that I kind of

25 adopted or that is more commonplace in the

57

1                    C. Wagner - by Ms. Elzer

2     State House, but you still get those kinds of

3     inquiries.

4                I mean, I'm really generalizing in

5     saying garbage or --

6          Q.    Right.

7          A.    -- street cleaning.  But typically

8     when those come to our office, so I know what

9     is going, I sign the letter that goes out to a

10    constituent saying, thank you for your call,

11    I'm glad that so-and-so at our office received

12    your call and directed you to such-and-such.

13    So I don't see it often --

14         Q.    Right.

15         A.    -- in terms of property assessments.

16         Q.    Okay.  So when these constituents

17    call with these general inquiries that you

18    described, who handles those?

19         A.    I mean, it depends what the issue

20    is.  So, I mean, it could be any number of

21    people.  If it's Weights & Measures, at the

22    time it was the individuals from Weights &

23    Measures.

24         Q.    Okay.  If it was property

25    assessments, who would it be, if you know?

58

C. Wagner - by Ms. Elzer

A.     No.   I mean, I'm aware of what
everybody does in the office.  You know, I
would say -- you know, I look at this in two
different periods, because, again, we had an
active audit, so during that time you are
soliciting more information.

So during that time it was -- it
could be anybody on our audit team.  So anybody
in our Audit Division, as well as let's say
folks from my administrative staff that would
most likely be there to assist would be Heidi
Nevala.

Q.     Okay.  The next bullet point on
Mr. Kaczmorski -- I'm sorry -- Mr. Cupelli's
job description says "attends all Allegheny
County Sheriff sales."  Is that a function that
anybody at the Controller's Office does now?

A.     No.

Q.     Has anybody done that since you have
been in office?

A.     Not unless they were doing it on
their own accord.

Q.     Right.  It's not a duty that was
assigned by you?

59

1                C. Wagner - by Ms. Elzer

2        A.    Correct.

3        Q.    Okay.  Third bullet point, this

4    "investigates tax liens and judgment requests

5    from taxpayers and management," we had talked

6    about the tax liens earlier.  Does anybody in

7    the Controller's Office now do these tax lien

8    functions?

9        A.    Nobody investigates tax liens and

10   judgment requests, no.

11       Q.    Okay.  What about investigates all

12   requests from taxpayers related to tax

13   collection?

14       A.    I'm not sure that I would even

15   understand what that really means, related to

16   tax collection.  But if there is a question, as

17   I understand it, specific to tax collection,

18   that is a function of the Treasurer's Office,

19   so, no.

20       Q.    Right.

21       A.    I mean, so there's not somebody

22   that's doing that function in my office.

23       Q.    Okay.  So if somebody called, then,

24   with a tax question, you said you don't just

25   hang up on them and say, that's the Treasurer's

60

1                    C. Wagner - by Ms. Elzer

2       Office, somebody in your office would handle

3       that?

4            A.    No.  That's not how I described

5       that.  I was saying that we wouldn't say, hey,

6       call this number, goodbye, likewise, if it's a

7       function of a different level of government.

8       So it's most typical if it's a federal or a

9       city issue, because we know that those folks

10      don't get follow-up.

11              But we work very closely with the

12      Treasurer's Office.  So in issues with the

13      Treasurer's Office, I think it's usually been a

14      lot more -- how would I describe that --

15      a lot more streamlined and a lot more

16      cooperative because the Treasurer's Office is

17      right next door to us.

18              So if somebody from my office sees

19      an employee from the Treasurer's Office, it's

20      fairly easy to say, hey, Mr. Smith called and

21      had a question about tax collection, did you

22      all handle that?  And we know that it would be

23      handled.

24           Q.    Okay.  So when you were talking

25      about not passing the buck, you're talking

61

1                    C. Wagner - by Ms. Elzer

2      about more different levels of government than

3      city, federal, or state?

4           A.    No.  I am talking about all of them.

5      But it's not a primary function of our office,

6      and that's where the difference is in

7      government.

8           Q.    Now, back to the job description.

9      The next bullet point says "serves as liaison

10     to various county boards and county committees

11     as requested by management."  Does anybody do

12     that now?

13          A.    Well, I -- it's not clear to me

14     which specific boards or committees would be

15     requested by their management, because this is

16     previous.  We have people attend different

17     meetings, but I do that not as a routine

18     activity, but as something that is informing

19     specific work of our office.

20               So, for example, last week I

21     attended a Port Authority Board meeting because

22     we are working, or not a Board meeting but a --

23     interviews for different candidates who were

24     bidding on the audit work for the airport.  Did

25     I say Port Authority?