# Appendix Tab B

1

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                    - - -

4   STANLEY M. KACZMORSKI and          )
    CARMEN CUPELLI,                     )
5                                       )
                 Plaintiffs,            )
6                                       ) Civil Action No.
            vs.                         ) 2:12-cv-1694-GLL
7                                       )
    OFFICE OF THE Controller OF         )
8   ALLEGHENY COUNTY and CHELSA        )
    WAGNER,                             )
9                                       )
                 Defendants.            )
10
                     - - -
11
                Deposition of CARMEN CUPELLI
12
                Monday, October 28, 2013
13
                     - - -
14
           The deposition of CARMEN CUPELLI, one of the
15   plaintiffs herein, called as a witness by the
     defendants, pursuant to notice and the Federal Rules
16   of Civil Procedure pertaining to the taking of
     depositions, taken before me, the undersigned,
17   Eugene C. Forcier, Stenographer Commissioner in and
     for the Commonwealth of Pennsylvania, at the
18   Law Offices of Ira Weiss, 445 Fort Pitt Boulevard,
     Suite 503, Pittsburgh, Pennsylvania 15219, commencing
19   at 11:36 o'clock p.m., the day and date above set
     forth.
20
                     - - -
21
                COMPUTER-AIDED TRANSCRIPTION BY
22               MORSE, GANTVERG & HODGE, INC.
                   PITTSBURGH, PENNSYLVANIA
23                    412-281-0189

24                   - - -

25

1      Q      Okay.

2             Would you agree with me that your last job

3      title, at the Controller's Office, was real estate tax

4      investigator?

5      A      Yes.

6      Q      Did you ever have a written job description

7      for the duties that you performed as a real estate tax

8      investigator?

9      A      No.

10     Q      You did not.

11            I am going to show you the document.

12            MR. McGRAW:  We will mark this.  I am going

13         to ask the court reporter to mark this as

14         Exhibit 1.

15            There you are, sir.

16            (Thereupon, Cupelli deposition Exhibit

17         No. 1 was marked for identification.)

18     BY MR. McGRAW:

19     Q      Mr. Cupelli, have you ever seen this

20     document before?

21     A      Not that I can remember.  Not that I

22     recall.

23     Q      Do you see at the top where it says, "Job

24     Description:  Real Estate Tax Investigator"?

25     A      Yes.

1    Q    It says, "Department/Bureau/Division:

2    Controller's Office/Support Services/Administration

3    Division"; is that correct?

4    A    Yes.

5    Q    Would you agree with me, that this appears

6    to be a written description of your position as real

7    estate tax investigator?

8    A    Yes.

9    Q    And do you see where it lists an original

10   date of May 6th, 2011?

11   A    Yes.

12   Q    Just above that, I should ask you, it

13   characterizes it as "Bargaining Unit:  Non-Union."

14   You were not in the union when you were functioning in

15   this role; correct?

16   A    Yes, correct.

17   Q    Do you know who prepared this document?

18   A    No.

19   Q    Do you recall providing any information for

20   the preparation of the document?

21   A    I don't recall that.

22   Q    Do you know at whose direction a job

23   description like this was prepared, or would have been

24   prepared?

25   A    No.

1     Q     As I said, the document reflects a date of

2   May 6, 2011; correct?

3     A     Yes.

4     Q     Do you agree with me that that was around

5   the time, I believe within a few days of the

6   Democratic primary, the most recent Democratic primary

7   for the Allegheny County Controller's race?

8     A     Yes.

9     Q     The document indicates, up in that top box

10   again, that the position reports to the T-A-W manager,

11   or perhaps TAW manager.

12           Did you report to the TAW manager?

13     A     Yes.

14     Q     Who was the TAW manager?

15     A     If I am correct, it was Stanley Kaczmorski?

16     Q     And Mr. Kaczmorski was formerly your

17   co-plaintiff in this lawsuit?

18     A     Yes.

19     Q     Mr. Kaczmorski was making the same

20   allegations against the Controller's Office, that you

21   are in this lawsuit?

22     A     That, I don't know.  I don't know what you

23   want.

24     Q     Okay.

25     A     Also, let me add this, that the manager, we

1    also had a person named Art Victor that may have been

2    that, the manager at that time.

3        Q      At which time?

4        A      At this particular time, in May.

5        Q      Okay.  So, Art Victor may have been in that

6    role, after Mr. Kaczmorski?

7        A      No, Art Victor was above both of us.

8        Q      I see.

9        A      To which we were reporting to him on a

10   daily basis.

11       Q      Okay.  so Mr. Kaczmorski maybe reported to

12   Art Victor?

13       A      Correct.

14       Q      Okay.

15       A      And I was also.

16       Q      Okay.

17              Moving down a bit here on the document, to

18   the bold type face that says, "Position Summary," it

19   says that the real estate tax investigator works under

20   the general supervision of the Assistant Deputy

21   Controller; is that correct?

22       A      Yes.

23       Q      It says that you investigate records in

24   regards to county wide property assessments, property

25   liens and sheriff sales.

1                    Did I read that correctly?

2          A       Correct.

3          Q       What kind of records did you investigate,

4    in regard to county wide property assessments, that

5    first item on the list?

6          A       The Controller at that time was interested

7    in the property assessment that has so much, so many

8    problems.

9                    We were getting phone calls on a daily

10   basis, and what we did, went to check on the

11   properties, went to see the properties that -- check

12   value on the computer lines, and people were

13   complaining the same property were to different

14   values, and Mark Flaherty was interested in knowing

15   that.

16         Q       So the Controller's Office was receiving a

17   high volume of phone calls about discrepancies in

18   property values?

19         A       Correct.

20         Q       Perceived discrepancies by taxpayers?

21         A       Yes.

22         Q       And you said Mr. Flaherty was interested in

23   attempting to resolve those?

24         A       Yes.

25         Q       When you say the county wide property

1   assessment, were these problems prompted by the now

2   infamous reassessment that we have heard so much about

3   over the last couple of years?

4       A       Correct.

5       Q       Okay.

6               What sort of information, when you went

7   on -- I am going to characterize it as one of these

8   investigations, what sort of information were you

9   looking for, looking to collect?

10      A       Well, we gather the value from the

11  computers as to assess the value, the market value the

12  properties, and follow up, check on these properties,

13  and then make phone calls to the people that were

14  calling us, to justify that.

15      Q       What was the ultimate outcome then?

16              Okay.  So you went on the county website,

17  and you checked on the values on the county website?

18      A       Right.

19      Q       That is public information; correct?

20      A       Yes.

21      Q       What was the ultimate outcome of your work,

22  or the Controller's Office's work, on behalf of a

23  taxpayer who called in the complaint?

24      A       Well, the complaints were always the same,

25  "My property next door, exactly the same, has a value

1   200,000, the property next to me, that's valued at a

2   hundred thousand.   Why?   And what's the reason?"

3            And those were mostly the complaints.

4   Why --

5        Q      Did you -- I'm sorry go ahead.

6        A      Why they were taxed at the different

7   values.

8        Q      So did you receive these phone calls

9   directly?

10       A      Some of the phone calls came into the

11  office, were direct to me.

12       Q      What did you the tell the taxpayer to do

13  when they said, "I think my house is estimated higher

14  than my neighbor's and I don't think that is fair"?

15       A      "We will check into it, and get back to

16  you," and we did that.

17            And then, we really -- we looked at the

18  properties, how much square footage they had, if it

19  was the same as others, and then we make the phone

20  call as to try to resolve their problem.

21       Q      Phone call to whom?

22       A      To the taxpayer.

23       Q      Did you make a phone call to anybody else,

24  on behalf of the taxpayer?

25       A      No, just the people who were calling us.

1  Q  So could you have done anything, from the

2 Controller's Office, about the value of their home,

3 whether it was fair or unfair, in your opinion?

4  A  No.  I -- no.

5  Q  So the Controller's Office wasn't able to

6 say, "Okay.  Now the value of your home is X amount

7 less"?

8  A  No.  No.

9  Q  Were you giving them -- well, let me ask

10 you this:  You are familiar with the appeal process

11 that the taxpayers have available to them, for

12 their" --

13  A  Correct.

14  Q  Okay.  Were you supplying legal advice to

15 taxpayers, as with respect to what they should do in

16 the appeals process?

17  A  No.

18  Q  Were You rendering an opinion as to whether

19 or not the value of their home was fair or unfair?

20  A  No.

21  Q  What were you telling them, when you called

22 them?

23  A  The phone calls were just based on a little

24 comfort as to the reason why as a taxpayer.

25    We were not giving legal advice, not at

1    all.  We were just looking into the properties, and

2    say, "Your properties, we don't know the reason why

3    one is higher than the other."

4         Q       Did you produce any written report to them,

5    and say, "We investigated your assessment, and this is

6    what we think"?

7         A       No.  They were happy with the phone calls,

8    that someone was looking into the problems they had,

9    and that they had an opportunity to appeal the

10   assessment.

11        Q       So there was never any written work product

12   with regard to this work?

13        A       No.

14        Q       Did you inform the taxpayers, initially,

15   when they contacted you, that there was nothing you

16   could do about the value of their home?

17        A       Yes, we did.

18        Q       And they asked you to investigate the value

19   still?

20        A       They didn't ask to investigate.  They were

21   looking for a little comfort, as to why.  They were

22   ranting to some people, they were complaining, they

23   had to complain to someone, and we were getting those

24   phone calls at the Controller's Office.

25        Q       What did you typically say to them that

1  provided that comfort?

2  　　A　　Well, we usually took the block and lot

3  numbers, address, went to look and make sure that the

4  properties were the same, and not the same by square

5  footage and value, and others, and we just made a

6  phone call back, saying, "This is your opportunity to

7  appeal and change it, and Allegheny County may change

8  it."

9  　　Q　　Did you advise them whether you thought it

10 was a good idea for them to appeal their specific

11 property?

12 　　A　　I -- no.  No.

13 　　Q　　So it would be fair for me to say, you

14 reviewed their property on the county website?

15 　　A　　Yes.

16 　　Q　　After they contacted you?

17 　　A　　Yes.

18 　　Q　　And you called the taxpayer back?

19 　　A　　Right.

20 　　Q　　And you recited information that they

21 already knew back to them?

22 　　A　　Correct.

23 　　Q　　And again, no written report, no written

24 work product, really, to that?

25 　　A　　No.

1      Q      Okay.

2             The second item is property liens.

3             What kinds of records did you investigate,

4  with respect to property liens?

5             What is a property lien?  Let's start with

6  that.

7      A      When property gets liened it's to a

8  nonpayment of taxes, and that kind of liens the

9  property, and eventually in the future they might have

10  a sheriff's sale, and those kinds of things, that is

11  the property, if they were late with payment of taxes.

12     Q      And you investigated these liens?

13     A      Well, we had phone calls, that they come in

14  and say, "I paid my taxes, and I show that I owe them

15  $5 plus the cost, and others."

16            Obviously, I went next door to the

17  Treasurer's Office, and said, "I had a phone call from

18  this individual, and they claim that they" -- and we

19  search, and did whatever, there was a balance of $5,

20  plus the costs, and others.

21            We called back, and say that they still

22  owed the $5 plus the costs.  That was not completely

23  paid.  Or they paid late.  Or they paid --

24     Q      What sort of records reflect that, what

25  kinds of records did you review?

1      A      Treasurer's Office has all of those

2   records.

3      Q      So this is primarily a function of the

4   Treasurer's Office?

5      A      Primary the Treasurer, but we were getting

6   those phone calls.

7      Q      How frequently did those phone calls come,

8   did you estimate?

9      A      At the highest point, maybe one a day, two

10  a day, three a week, you know, there was --

11     Q      Is that a typical function of the Allegheny

12  County Controller's office in your understanding, or

13  was that just something that a taxpayer erroneously

14  called you?

15     A      Well, the taxpayer know it's the

16  Controller's Office, they probably were looking for

17  answers.

18     Q      Did you inform the taxpayer that that was

19  information that they would -- that would be more

20  properly inquired about at the Treasurer's Office,

21  since it is a Treasurer's function?

22     A      Well, because we assume that all the

23  taxpayer only have this knowledge, they grab it, the

24  first phone number, and they call.  You know, some

25  went to one department, some went to another, but that

1   was the reason for the phone calls.

2        Q       Okay.

3        A       We tried to be helpful on the phone calls

4   we were receiving.

5        Q       Who directed you to investigate those

6   property liens, and do that for taxpayers?

7        A       This was something that Mark Flaherty

8   wanted done.

9        Q       Did you produce any written report, based

10  on those investigations, based on the property lien

11  investigations; any writing?

12       A       No, there was no need to.

13       Q       Because you didn't write a letter to the

14  taxpayer, send it --

15       A       No.

16       Q       -- saying, "I looked into your property" --

17       A       No.

18       Q       -- "your tax lien, and here is the file"?

19       A       No.

20       Q       Did you call them back?

21       A       Yes, I did.

22       Q       The third item on the list is sheriff's

23  sales.  What kind -- you said you reviewed,

24  investigated records in regards to sheriff's sales;

25  what kind of records did you review with respect to

1   sheriff's sales?

2        A      Sheriff's sales.  Always had problems with

3   the sheriff's sale, in recent way that the properties

4   up for tax liens, and others, they were put up in the

5   sheriff's sale, to which the time came when it was

6   sold at sheriff's sale.  We also knew it, that some of

7   the law firms in the city were, at the last moment, to

8   the sale, they would sell this property free and

9   clear, with the court order, to which that, the owner

10  of the property may have a loss to that property for

11  few thousand dollars, or a few hundred dollars.

12           And we were aware of those things, and

13  Mark Flaherty was also interested in find out exactly

14  why it was going on.

15       Q      You said there were certain law firms

16  around town that were --

17       A      Yes.

18       Q      And explain to me again, it is hard to

19  follow you there, what was problematic about what was

20  happening there?

21       A      What was happen was that the property goes

22  up for sheriff's sale, will come a day that the

23  property is sold at sheriff's sale.  There was deposit

24  for a hundred thousand dollars.

25           Once the day of the sale came into play,

1   the property, instead of selling for a hundred

2   thousand dollars, they may have been sold for cost

3   only, 1,700, for attorney fees, and this was a known

4   going problem that they had.

5         And the Controller was interested in

6   knowing what went on, how the it came to that point.

7   Q     The nature of a sheriff sale -- correct me

8   if I am wrong -- is such that a property may be listed

9   for a given amount, an amount that is being sought,

10  but unless a bidder shows up to pay that amount, it

11  doesn't sell for that amount; is that correct?

12  A     No, because we had people -- we have the

13  bid that they shopped for the property.  The property

14  sale started let's say a hundred thousand dollars, but

15  at some point, if no one was bidding 100,000, we had

16  problems.  The attorney used to say, "We will sell, no

17  bidder there at a hundred thousand, let's lower it to

18  40,000."

19        Once it is lowered to 40,000, we still had

20  no bidders, because the property was too high, or

21  whatever the reason was.  At the last, very last

22  moment, they said, "We will sell the property for cost

23  only."

24  Q     Uh-huh.

25  A     And we always say for cost only, and not

1    only they sold for cost only, they also sold for what

2    is considered free and clear.  Free and clear was all

3    the tax, or the revenues, you know, that was a court

4    order that they had, to which was made, the property

5    was made free and clear, and there was always one

6    buying the property.

7         Q     What was there for you to investigate,

8    then?  It sounds to me, someone didn't want to pay for

9    what they were asking for it.

10        A     Well, that is not for me, that is a

11   question for Controller Flaherty.

12        Q     What did you tell him when you got back?

13        A     Of course, I tell him what happened.

14        Q     He sent you to find out the reason; didn't

15   he?

16        A     He didn't send me to find out the reason,

17   he sent me there to find out what went on at the

18   sheriff's sale, and I said exactly what I said.

19        Q     So you told him what went on, the property

20   sold for --

21        A     What went on, the property was assessed for

22   100,000, and was sold free and clear and for cost

23   only, 1,700.

24        Q     He knew that's going in, that's why he sent

25   you in the first place; isn't it?

1   hundred thousand, may have a lien by taxing body for

2   60,000.  If you buy the property now at a certain

3   price, the tax follows the property.  The Duquesne

4   Light light bill follows the property.  All of those

5   things follow the property as a cost.

6          But if they sold the property free and

7   clear, what I said was that they went to court, they

8   got a court order, to which it was clear all the

9   costs, all of those costs.

10          And someone could have the property for a

11  thousand dollars.

12  Q      Is it your testimony that Controller

13  Flaherty did not previously understand the process

14  that you just described to me?

15  A      I don't know if he understood or not.  I

16  don't know what he understood.

17          I know that I was sent there, and those

18  were the basic reasons we were there, to see if it

19  really happened.

20  Q      And I'm not trying to trick you,

21  Mr. Cupelli.

22  A      Yes.

23  Q      I just want to know what Controller

24  Flaherty didn't know, that he needed to know, and he

25  needed to send you to a sheriff's sale to come back

1  and tell him, and then -- well, why don't you tell me

2  that first, what did he not know?

3      A     I don't want to be disrespectful to you,

4  but I think you need to subpoena Controller Flaherty,

5  he knows the answer.

6      Q     Well, did you not understand why you were

7  being sent to the sheriff's sale?

8      A     I know that I was there, he says, "You go

9  to the sheriff's sale," and every sheriff sale I went

10 to.

11     Q     What did he ask you, when you got back from

12 the sheriff's sale?

13     A     The conversation was always the same for

14 those reasons.

15     Q     Did you write a report and give it to him?

16     A     He -- no.  He didn't ask for a report.

17           "Did you go to the sheriff's sale?"

18           "Yes."

19           "What did happen today?"

20           "This went on."

21           "Okay."

22     Q     You went to every sheriff's sale?

23     A     I did.

24     Q     And they happened once a month, typically;

25 is that correct?

```
 1      A      Right, correct.

 2      Q      First Monday of the month?

 3      A      Correct.

 4      Q      When was the first, if you recall, around

 5   the time period, the first sheriff's sale that

 6   Controller Flaherty sent you to?

 7      A      Oh, God.

 8             Immediately after he was -- won the

 9   election, and the --

10      Q      What did he say when he sent you the first

11   time?  "Carmen, go find out this for me," what was

12   that?

13      A      He wanted someone at the sheriff's sale,

14   see if those things are really went on.

15      Q      Did he ask you -- well, to see if those

16   things really went on.  He could find that out by

17   looking at a documentation, post sheriff's sale;

18   couldn't he?  I mean, is there documentation at the

19   sheriff's sale, of what went on; is there

20   documentation as to what property sold for at a

21   sheriff's sale?

22      A      I don't have the answers to that.

23      Q      Okay.  So you don't know if it's public

24   knowledge, as to what property?

25      A      I am sure it is public knowledge.  I don't
```

1    have answer as to why he sent me.

2         Q        Okay.

3              Did he direct you to tell anybody else in

4    the Controller's Office what you saw that day at the

5    sheriff's sale; is it, "Carmen, produce this report to

6    this employee, after you get back"?

7         A        No.

8         Q        Did that ever happen?

9         A        No.

10        Q        You never went and saw anybody else in the

11   Controller's Office --

12        A        No.

13        Q        -- and say, "Here is what happened at the

14   sheriff's sale"?

15        A        No.

16        Q        And you never saw any outcome of your

17   investigation at the sheriff's sales, as far as a

18   report that was issued by the Controller's office

19   after the fact; the things that you told Controller

20   Flaherty were never, say, published in a report by

21   him, or anything like that, that you know of?

22        A        Not that I know.

23        Q        Yes.

24             Is there a log at the sheriff's sale; did

25   you sign into a logbook, that you were there?

1       A       There was no log there.

2       Q       Did you ever talk to the sheriff?

3       A       Oh, of course, I spent time with the

4   sheriff every day.

5       Q       Did the sheriff ever call you and ask you

6   for an opinion about, say an upcoming sale, or a sale

7   that just happened; call you at the Controller's

8   office?

9       A       He did.

10      Q       What did he ask you about?

11      A       He didn't ask about it, he gave us some

12  information regard to some sales, the way the sales

13  were sold, the properties were sold under this

14  condition, I just tried to --

15      Q       What kind of information was that; what did

16  he tell you?

17      A       Well, I remember one specific occasion,

18  2007, 2008, 2009, I am not sure, in there, there was a

19  golf course sold in the Monroeville area, that I don't

20  recall, they gave a 10 percent down, Friday was the

21  date that they had to pay the balance, couple hundred

22  thousand dollars, or so.

23              The buyer, the seller, there was a taxing

24  body seller, they all show up at the sheriff's sale,

25  and the fellow said, the buyer said, "Well, you know,

1   I changed my mind," and the policy, the sheriff, he

2   said, "If you change your mind, you lose the

3   10 percent," you give it to them the day of the sale.

4          He was prepared to lose 10 percent on this

5   property.

6          But at the same time this going on, there

7   is a third person there, to which he's going to buy

8   the property again, not for the sale that was sold at

9   sheriff's sale, but even for less, and yet the taxing

10  body, that brought the sale, okayed the sale to be

11  sold for even less than what was sold originally.

12  Actually, there is a court, Superior Court, or

13  Commonwealth Court decision on that, that they

14  reversed the sale.

15      Q      So, what did that sale have to do with the

16  Controller's Office then?

17      A      I don't -- that, I don't know.

18      Q      What did they ask you to do in the context

19  of that sale?

20      A      That has to do -- well, that's the first

21  time I brought it to his attention, that this was

22  going on.

23      Q      But, you brought this to his attention, to

24  the sheriff's attention?

25      A      The sheriff's department call me, that this

1   was an ongoing situation, and I mentioned it to

2   Mark Flaherty.

3         Q     What did Mark do with that information; do

4   you know?

5         A     Well, that's how I think, how we started to

6   go to the sheriff's sale from then on.

7         Q     Did the Controller's Office produce a

8   report; did they to an audit based on what you found

9   out there?

10        A     That, I don't know.

11        Q     So, is it fair so say, then, that when you

12  went to the typical sheriff's sale, you observed

13  whatever it is that you observed at the sheriff's

14  sale, and then returned to the office, and didn't

15  speak, nor otherwise communicate to anybody about what

16  you had just observed there?

17              I mean, did you go and find anybody and

18  talk to them about it?

19        A     I had no reason to, no.

20        Q     All right.

21              Back to the job description you have in

22  front of you there, there is an itemized list of

23  duties, and it's the next bold face type on down

24  there.

25              The first thing says that you investigate

1    all requests from Allegheny County taxpayers related

2    to property assessments.

3            Now, we talked a little bit about that

4    already.  Just so that I am clear, that was you got a

5    phone call, and then you called them back with the

6    information from their property card on-line; is that

7    correct?

8        A    Correct.

9        Q    Okay.

10           You -- on that subject, you were let go,

11   you were furloughed, or terminated, whatever you want

12   to call it, by the Allegheny County Controller's

13   Office January 2nd of 2012; is that right?

14       A    I was let go.  I was let go, January --

15   yes.

16       Q    And you said this stuff that you do with

17   respect to property assessments, most of that is

18   already happening as a result of the county wide

19   reassessment; correct?  They were calling you, because

20   they got their new assessed values, the taxpayers?

21           Would you agree with me that the new

22   assessed values, under the county wide reassessment in

23   Allegheny County, were not released to the taxpayers

24   until January of 2012?  In the city at least?

25           I realize other jurisdictions had different

1           What were you investigating there?  I mean,

2    was that -- again, we talked about it to some extent,

3    but judgment requests, this is the first we are

4    hearing about that, what did you investigate with

5    respect to the judgment requests?

6           A      Well, Allegheny County liens the

7    properties.  And people were getting liens for $5, for

8    a $10.  Those records are available.  For $5

9    nonpayment of tax, we lien properties, and we were

10   getting phone calls as to, "I did pay," "I did not

11   pay," I did others, we went to investigate the

12   situation, then get back to the people and say, "You

13   still owe the $5, that was the reason why the property

14   was liened."

15          Q      What's a judgment request?

16          A      Well, the judgment was for a judgment on a

17   property.

18          Q      Is it the same as a lien?

19          A      A lien.

20          Q      Okay.  And you investigated these judgment

21   requests -- it says from taxpayers and management.

22   That would have been a request from management?

23          A      They were interested at the time, because

24   they were also getting phone calls.

25          Q      Who is they?

1     A     Mark Flaherty.

2     Q     Mark Flaherty?

3     A     I don't know, the office, or personnel, or

4  whatever, but I was given a piece of paper, say,

5  "Here, this is the block number, has a lien, judgment

6  on this property.  Why?"

7     Q     And, did you typically find out why?

8     A     Yes.

9     Q     And then you -- as we talked about earlier,

10  you called the taxpayer back?

11     A     Yes.

12     Q     But you didn't write them a letter, or give

13  them any report?

14     A     No, there was no need for a letter, "You

15  pay the $5, release your property."

16     Q     Okay.  So you called back and said, "You

17  should pay $5"?

18     A     Well, whatever the amount was, I am not

19  sure it was really $5

20     Q     Okay.  Did you report back to Mark when you

21  did that?

22     A     Yes, I did.

23     Q     It says you investigate all requests from

24  taxpayers related to tax collection.

25          Specifically, what does that mean?  Now we

1  are talking about tax collection.  What did you do

2  with respect to tax collection?

3       A    I -- tax collection, and tax lien, to me,

4  is the same.

5       Q    So, are you saying that this line, which

6  reads, "Investigates all requests from taxpayers

7  related to tax collection," is perhaps duplicative of

8  the line before it, "Investigates tax liens and

9  judgments from taxpayers and management;" are those

10 two the same thing in your mind?

11      A    In my mind, they are the same.

12           The tax collection were from people that "I

13 did pay my taxes, why do I get this notice?"

14           It wasn't paid, or it was because they were

15 paid late, and they still -- this was all interrelated

16 to that.

17      Q    So, did taxpayers call the Controller's

18 Office and say --

19      A    "I paid my taxes, why am I getting this

20 letter from the office?"

21      Q    Is the Controller's Office responsible for

22 collection of taxes, directly?

23      A    I am not certain.

24      Q    Okay.  Were you aware of anybody in the

25 Controller's Office acting in the role of tax

```
 1   collector?

 2         A      The Treasurer is the tax collector.

 3                I may be wrong, that the mailers also have

 4   Controller's Office name on it.

 5         Q      What has the Controller's Office name?

 6         A      The mailer that went to customers.

 7         Q      Okay.  Did anybody in the Controller's

 8   Office act in the role of tax collector?

 9         A      I don't know.  That I don't know.

10         Q      Did anybody ever leave the office and say,

11   "I am going out to collect taxes," did anybody say,

12   "Today I'm going over some tax collection

13   documentation," to you?

14         A      No.

15         Q      But you were investigating them; right?

16   Did it ever come up, that you folks were also

17   collecting taxes?

18                Did Mark ever say, "We have a problem with

19   the taxes that we are collecting;" was that ever

20   mentioned to you?

21         A      I -- no.

22         Q      Okay.

23         A      We don't collect the taxes.

24         Q      So would you agree with me, that it's --

25   I am going to characterize it as virtually impossible
```

1   that you were investigating anything related to the

2   Controller's Office collection of taxes?

3        A      Only if we got phone calls.

4        Q      Okay.

5        A      We do get phone calls, saying, "I paid my

6   taxes, and I'm still get a mailer, why am I getting a

7   a fee, plus all of those things, because my taxes are

8   paid."

9        Q      I am a little bit unclear how you were

10  getting these phone calls.  I mean, physically.  I

11  know this is a weird question, but I guess when you

12  call the Controller's Office, you get a receptionist;

13  is that right?

14       A      Yes.

15       Q      If the receptionist picked up this call,

16  and there was a taxpayer on the line saying, "I am

17  having a problem how my taxes are being collected,"

18  they patched it through to you?

19       A      Yes.

20       Q      And you were sitting at the desk waiting to

21  get these phones calls?

22       A      Well, either I was sitting on the desk or

23  whenever I come back I get a note that taxpayer so and

24  so called, and return the phone call to her, and I did

25  that.

1      Q      How frequently would this happen?

2      A      There was a period time it was frequent,

3  every -- on a daily basis.

4      Q      What period of time would that have been?

5      A      I -- you know, I don't really recall that.

6      Q      But not consistently; it wasn't

7  consistently a frequent issue; is that fair to say?

8      A      It was not on a daily -- daily basis,

9  no.  There were the times the taxes were mailed out.

10      Q      So what did you do on the day that there

11  weren't phone calls from misguided taxpayers calling

12  you about things that the Controller's Office doesn't

13  do?

14      A      We always had a problems, went -- spent

15  more time, I spent probably more time in the sheriff's

16  office, related to properties.

17              I -- we were doing a project with Marcellus

18  shale, as mentioned before, all of us went to work

19  there for months and months.

20              We -- let's see.

21              We -- Kaczmorski, Stanley and Art Victor,

22  they wanted to -- I was mostly checking high end

23  properties, they went on the tax role for 40 percent

24  of the value, or 30 percent.

25              I remember one particular case that there

1    was a $8 million home, assessed at $8 million, but

2    they were paying tax only on 900,000.  So, every day,

3    I used to look for those properties.

4         Q      When you found one of them, what did you

5    do?

6         A      I give them to Stanley, and Art Victor.

7         Q      Do you know what happened to that

8    information after that?

9         A      I remember we had a conversation as to, if

10   we bring that value, to assess the value to market

11   value, the county have a benefit of millions of

12   dollars in tax revenue.

13        Q      To your knowledge, are taxing bodies,

14   municipalities, whether that is a school district, or

15   a township, whatever the case, the county, even, are

16   they permitted to appeal the value of a parcel of real

17   estate, just as a taxpayer is permitted to appeal that

18   value?

19        A      Yes.

20        Q      The situation, that you just described to

21   me, wherein someone is being taxed at 30 percent of

22   their true value, something like that, did you flag

23   that for the Office of Property Assessment, or for

24   that matter, did you contact the municipalities and

25   let then know that they had a dramatically under

1   valued parcel within their municipal boundaries, that

2   they might want to take a look at?

3       A       I remember correctly, they were all given

4   to Stanley, and Art Victor.

5       Q       Okay.

6       A       I used to print them, and give copy to

7   them, so --

8       Q       You don't know what Stan and Art did after

9   that?

10      A       I don't know what Stan and Art did with it.

11      Q       The next item on the list here says that

12  you answer citizens' requests for land, mineral rights

13  and right-of-way issues.

14              Can you give me some examples, or tell me

15  what went on there, with the land and mineral rights,

16  and so on?

17      A       Well, this was the Marcellus shales.

18      Q       Okay.

19      A       We spent months looking at those

20  properties, the mineral rights, the mineral rights to

21  the airport, the Federal Government, all of those

22  things.

23      Q       You say "we," who --

24      A       Well, because it was always someone with

25  me, mostly we have these big bulk books that you have

1   to search through them, give it, look at it.

2        Q      What were you searching for?

3        A      Well, for the mineral rights, for the oil

4   rights, for the gas drilling, for all of those things.

5        Q      Okay.

6               Who asked you to search for those rights?

7        A      That was a little project from

8   Mark Flaherty.

9        Q      Did you -- it sounds like you are giving a

10   title opinion.  Are you familiar with what a title

11   opinion is?

12       A      No.

13       Q      No?  Okay.

14              Were you rendering an opinion as to who

15   owned, say, certain mineral rights; is that what you

16   were looking for?

17       A      I was not rendering that in that kind of

18   mineral rights per se.  I was only rendering what the

19   deed, at the county office -- at the County Office

20   Building says.

21       Q      So you were --

22       A      Because we were going from the Controller's

23   Office to the County Office Building, where we find

24   the original deeds to the property, that was deeded

25   from one person to another, and that's what we did.

```
 1      Q      Are you aware of functions related to
 2 mineral rights being a statutory function of the
 3 Controller's Office, something the Controller's Office
 4 is tasked with?
 5      A      No.
 6      Q      No?
 7      A      Don't have the answer to that.
 8      Q      Okay.
 9             How frequently were you called to
10 investigate Marcellus shale mineral rights?
11      A      There was a period of time we spent months
12 search for all of those properties.
13      Q      On behalf of whom?
14      A      Mark Flaherty.
15      Q      So Mark Flaherty said to you, "For my
16 personal knowledge, I want to know who owns all of the
17 mineral rights in this county"?
18      A      I -- Mark Flaherty never said to me exactly
19 that.  Mark Flaherty made it clear it was interest for
20 Marcellus shales.
21             The property at the airport, and other
22 properties the county owned, and all of the other
23 properties, he was interested, and we did that.
24      Q      Did he tell you why he was interested?
25      A      No.
```

1     Q     You didn't ask?

2     A     No.

3     Q     And, you didn't follow up with any type of
4  written report, on what you found?

5     A     There were others who did the written
6  report.

7     Q     But you didn't produce that report?

8     A     I did not.

9     Q     Okay.  Who were on some of the other people
10  who were doing this investigation with you; can you
11  give me some names?

12     A     Terry Matuszak was there,
13  Stanley Kaczmorski was there, I was there.

14     Q     You were where, by the way, you're
15  referencing this place?

16     A     We were in reference to the County Office
17  Building, to which all of the deeds and all of those
18  stuff.

19     Q     Okay.  I'm sorry, I interrupted you when
20  you were giving a list of names.  Matuszak,
21  Kaczmorski.

22           Anybody else?

23     A     Kaczmorski.

24           Then there is a young fellow, that escapes
25  me now.

1           There is one more person, escapes me, the

2      name, which put the report together.

3      Q      And he is the guy that wrote the report?

4      A      Put the report together, yes, sir.

5      Q      Terry Matuszak wouldn't have written the

6      report?

7      A      No.

8      Q      And Stanley Kaczmorski wouldn't have

9      written the report?

10     A      No.

11     Q      So there is this other young guy who wrote

12     reports.

13          Do you know if this person is still

14     employed by the Controller's Office?

15     A      No, he was let go.

16     Q      He was let go.  Okay.

17          How frequently was Terry Matuszak working

18     on Marcellus shale issues for Mark Flaherty?

19     A      I --

20     Q      Okay.

21     A      -- don't know.

22     Q      What about Stanley Kaczmorski, do you

23     recall him being heavily involved in Marcellus shale?

24     A      I don't know how heavy involved they were.

25     Q      Stanley Kaczmorski's position was -- was it

1       A       I mean -- I'm sorry, I mean we, I mean, I

2   went.

3               The Sport Authority, the Port Authority

4   authority, the Shuman Center, I went alone.

5       Q       Did you go every month; you were the sole

6   attendee at these meetings?

7       A       I was supposed to go.  The meetings were

8   not always every month.  They were --

9       Q       Did you attend them all, though, whenever

10  they did happen?

11      A       Most of them.

12      Q       Did anybody else from the Controller's

13  Office ever attend them?

14      A       Shuman Center, no one attended.

15              Sport authority, from time to time there

16  were a couple of people, which they went.

17      Q       When you attended one of these meetings, on

18  behalf of the Controller's Office, whatever meeting it

19  may have been, did you ever give some report, or

20  perhaps extol a position of the Controller's Office to

21  whichever board was meeting there; did you ever speak

22  to any of them?

23      A       No, not really.  Our presence was just

24  there, to be present.  They were representing the

25  Controller's Office, nothing more than that.

```
 1      Q      Did you field questions from those board

 2 members --

 3      A      No.

 4      Q      -- to the Controller's Office?

 5      A      No.

 6      Q      When you got back from one of those

 7 meetings, did you write down any report, or any

 8 summary of what had taken place at the meetings?

 9      A      No.

10      Q      Did you give anybody a verbal report, as to

11 what had taken place at the meeting?

12      A      To Mark?

13      Q      To mark.

14      A      He used to say, "Did you attend the

15 meetings?"

16             "Yes."

17             "What went on?"

18      Q      Anybody other than Mark?

19      A      No.

20      Q      Okay.

21      A      No.

22      Q      It says, "Submits progress management

23 reports as needed," on the next item down there.

24             Can you describe what a progress management

25 report was?
```

1      A      No.

2      Q      Okay.  Next item is, "Manage special

3  projects as needed."

4             I suppose we have talked a little bit about

5  what can be considered special projects, one I assume

6  to be the Marcellus shale project that you described.

7             Can you describe any other special

8  projects; those that you worked on, at least?

9      A      There was a time that they were looking at

10  cars, rentals, leases, and purchase for the county, to

11  which I did the special project.

12      Q      But what was the nature of the project?

13      A      There was the cost of leases, compares to

14  purchase, how much gas, how much expense we had, and

15  who was driving what cars, and how much the cost was

16  to the county.

17      Q      Okay.  So the Controller's Office -- is

18  that an audit?  Would that be fair to characterize it

19  as an audit?

20      A      It wasn't really an audit, it was something

21  that they want done, they asked me to do it, and I did

22  that.

23      Q      What did you specifically do, in the course

24  of this project?  I want to get an idea of what kind

25  of work you did.

1     A     Well, I went over to -- first, I went to --
2  I find out which cars we had that were driven by
3  officials, county officials, and just county in
4  general.
5           And then we looked at the cost of leasing,
6  in comparison to cost of buying.
7     Q     You said "we;" did somebody work on this
8  project?
9     A     No, I did -- sorry, I did the project
10 myself, I mean, that was the interest they had.
11    Q     What type of --
12    A     To save any money.
13    Q     What type of information or documentation
14 did you review, to do that comparison?
15    A     Well, that's -- we have a fleet department
16 with the county, over there they have the car, the
17 numbers, who drives which car, the cost of the lease,
18 all of these things.
19          I compared them.
20    Q     The fleet department, then, you were
21 communicating with folks over there, to get an idea of
22 what they were doing, or what these relative costs
23 were?
24    A     Well, when you represent the Controller's
25 Office, you have a certain policy, you go there and

1 you something a little bit more specific than that.

2 Do you recall having been nervous during the

3 interview?

4      A     I was not nervous with J.J. and Marty.  If

5 I was nervous, it was the Controller --

6      Q     When you talked to Chelsa?

7      A     -- maybe I did.

8      Q     But Chelsa wasn't in that meeting; right?

9      A     No, she wasn't.

10      Q     Did J.J. and Marty ask you to describe your

11 average workday at the Controller's Office?

12      A     I don't really hundred percent remember

13 that.

14      Q     Did you agree with what Mr. Abbott said

15 about your having a written list of your duties, that

16 you read during that meeting?

17      A     I did not have that.

18      Q     You did not have a list?

19      A     No, I didn't do.

20      Q     Okay.  So his testimony was not accurate?

21      A     Absolutely.

22      Q     With respect to that.  Okay.

23          Did they ask you for your, I guess I will

24 call it advice, on any aspects of the functioning of

25 the Controller's Office, anything that you thought

```
 1    maybe could have been done better, anything that was a

 2    problem?

 3         A     No.

 4         Q     How long do you remember the meeting

 5    lasting for?

 6         A     Repeat it, please.

 7         Q     Oh, I'm sorry.

 8               The total time that you were meeting with

 9    those guys, about how long was it?

10         A     Ten, 15 minutes.

11         Q     Okay.  Well, a little over a month after

12    that meeting, you found out that you would be laid

13    off; is that correct?

14         A     I received that resignation letter,

15    whatever, yes.

16         Q     All right.  Let me show you the termination

17    letter, that you just referenced, to you.

18               MR. McGRAW:  If the court reporter would

19          kindly mark that as Exhibit No. 3.

20               (Thereupon, Cupelli deposition Exhibit

21          No. 3 was marked for identification.)

22    BY MR. McGRAW:

23         Q     Is that the letter that you received,

24    Mr. Cupelli; the one that you referenced a moment ago?

25         A     Yes.
```

1       Q       Okay.

2       A       That was --

3       Q       The second sentence of the first paragraph

4   of the letter explains that "It has been determined

5   that based upon the 2012 budget and the organizational

6   needs of the office as envisioned by Ms. Wagner as

7   well as other important factors which have been

8   considered, Ms. Wagner will take official action to

9   reduce certain personnel in the Department.  Policy

10  8.0 provides that employment in the Office of the

11  Controller is at will.  As such, Ms. Wagner will take

12  steps on January 2nd, 2012 to eliminate your position

13  and you will be laid-off effective on that date."

14              Did I read that correctly, sir?

15      A       Yes.

16      Q       So it says that your position was

17  eliminated; correct?

18              Is that the explanation given?

19              Does it say eliminated?

20      Q       The last sentence of that first paragraph,

21  "As such, Miss Wagner will take steps on January 2nd,

22  2012, to eliminate your position;" correct?

23      A       Yes.

24      Q       After you received this letter, which

25  I suppose was either on or shortly after

1    December 23rd, 2011, as it's dated, did you talk to

2    anyone about it?

3        A      I don't understand the question, as to who

4    did I talk to about it.

5        Q      Anyone.

6        A      Anyone in the office, anyone in the

7    administration, anyone --

8        Q      Anyone generally.  We will start with

9    anyone in the office, though.

10        A      At some point in time, yes.

11        Q      Some point in time, you spoke with someone?

12        A      Well, because we went back to work prior to

13    her coming in, and was knowledgeable that we were let

14    go.

15        Q      Do you remember who that would have been,

16    in the office?

17        A      No.

18        Q      Did you talk to Chelsa Wagner about it?

19        A      No.

20            MR. McGRAW:  We are coming up on 1:00

21        o'clock, I don't know what you guys -- I mean,

22        this might be a decent stopping point, if

23        everyone wants to go out and do lunch here for a

24        little while.

25            I think I have more than everyone is going

```
 1    to want to sit through, without having, taking at

 2    least a short break.

 3           I don't know how to you want to handle it.

 4           MS. ELZER:  That's fine.

 5           MR. McGRAW:  Okay.

 6           THE VIDEOGRAPHER:  We are going off the

 7    record at 12:53.

 8                     -  -  -

 9           (Thereupon, at 12:53 o'clock p.m., a

10    luncheon recess was taken to 1:50 o'clock p.m.)

11                     -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       A       Some fellow that was working for us.

2       Q       Working for who?

3       A       At the phone store.

4       Q       Okay.  Jim Miller wasn't employed in the

5    Controller's Office?

6       A       No.

7       Q       Was he employed by the county?

8       A       No.

9               MR. McGRAW:  This will be Exhibit 16.

10              (Thereupon, Cupelli deposition Exhibit

11      No. 16 was marked for identification.)

12   BY MR. McGRAW:

13      Q       This is a copy of -- well, we talked about

14   this a little bit earlier, but this is a copy of the

15   EEOC complaint that was filed, along with the

16   complaint that you filed, or along -- in this case,

17   along with the complaint that you filed, the civil

18   complaint in Federal Court.

19              Have you ever seen this document before;

20   Mr. Cupelli?

21      A       If I have, I don't remember.

22      Q       Okay.

23      A       I don't recall that.

24      Q       You don't recall.  You look at page, it is

25   listed as page 2, it is actually the third page of the

1  document, is that your signature there, at the end?

2      A     Yes.

3      Q     And, it's signed October 15th of 2012, so

4  just over a year ago; correct?

5      A     Okay.

6      Q     Go one page back up, to page 1, but again

7  the second page of the document that I handed you.

8      A     Okay.

9      Q     Paragraph No. 5, close to the bottom of the

10 page, alleges that upon your being laid off, which we

11 hear about in paragraph 4, January 2nd, 2012, it says,

12 paragraph 5 says, "I was replaced by a substantially

13 younger individual."

14           Who was that individual who had replaced

15 you?

16      A     We understood that Joe Asturi, that is no

17 longer there, was doing typically the works we were

18 doing for Mark Flaherty.

19      Q     Who was it?  I'm sorry, I didn't hear.

20      A     Joe Asturi.

21      Q     Can you spell that?

22      A     Joe A-s-t-o-r-i, maybe.  Asturi.

23           MS. ELZER:  A-s-t-u-r-i.

24           MR. McGRAW:  Asturi, okay.

25      Q     And, you say you understood him to be --

1      A      I -- we heard that.  I don't -- I was not

2   in the office.

3             But then I have no contact with the office

4   at all.

5      Q      Who told you that Asturi was doing the work

6   that you were doing?

7      A      I don't really remember who, because there

8   was always conversation, all of us getting fired, and

9   people were saying things.

10     Q      When were these conversations?

11     A      Well, sometime in January.  Sometime in

12  January 2012.

13     Q      After --

14     A      After.

15     Q      After you were terminated?

16     A      I was terminated December.  I was

17  terminated before Chelsa Wagner was sworn in.

18     Q      So you heard these conversations in the

19  office?

20     A      The people we were talking to, there was

21  seven, eight of us let go, and whenever we had a

22  conversation, everyone was saying, "Oh, yeah, they let

23  us go, but that person did this, or the other person

24  did that;" there was --

25     Q      That's what I want to know, where was this

1   conversation going on?

2       A      This is with the people already had left

3   the office, everywhere, we talked on the phone, we saw

4   each other; when we saw each other, there was a

5   conversation going on.

6       Q      Well, who told you Joe Asturi was doing the

7   job that you were doing?

8       A      I don't remember exactly.  I don't recall a

9   specific person that said that.

10      Q      Do you recall when that was said to you?

11      A      Well, sometime after we let go.

12      Q      Okay.

13      A      After we were let go, there was general

14  conversation, who was doing what.

15      Q      What did they tell you about what

16  Joe Asturi was doing?

17      A      That he was there.  I don't know the title

18  he had, I don't know the work he did.

19             There was a conversation between the people

20  who were let go, that all of us kept on saying, "Oh,

21  yeah, he does less than anybody."

22      Q      So, another person who was no longer

23  working in the Controller's Office, told you what they

24  knew about what was going on in the Controller's

25  Office; is that correct?

1     A      There was some conversation with eight,

2   nine people, they let us go.

3     Q      None of them were working in the

4   Controller's Office at that time?

5     A      We were not in, we were not there, we were

6   fired, as far as we know.

7     Q      Okay.  So your -- the extent of your

8   knowledge, about who is allegedly serving in your

9   role, or was serving in your role in the Controller's

10   Office after you were terminated in January of 2012,

11   was based upon the representations of other terminated

12   employees?

13     A      Yes.

14     Q      Okay.

15            Paragraph 6 of the EEOC complaint says that

16   "Respondent also fired several other employees over

17   the age of 50, and replaced them with substantially

18   younger individuals."

19            Can you identify who those people were,

20   that were terminated, and who the younger individuals

21   were who replaced them?

22     A      I -- not without a list of the people.  I

23   don't -- you know, I don't remember.  I don't know who

24   was there.

25     Q      Can you give me an example of one

1    terminated person, and their younger replacement,

2    other than your own alleged replacement?

3        A    I don't have a list of that.

4        Q    Okay.

5        A    With names.

6        Q    But you will agree with me, that you signed

7    off on that as a fact in this complaint?

8        A    Those -- yes, I did sign that.

9        Q    Okay.

10            MR. McGRAW:  I am going to, this is going

11            to be Exhibit No. 17.

12            (Thereupon, Cupelli deposition Exhibit

13            No. 17 was marked for identification.)

14    BY MR. McGRAW:

15        Q    There you go, sir.

16            This is the civil complaint, the most

17    recent version, I suppose, of the civil complaint that

18    you filed against the Controller's Office; is that

19    correct?

20            The second amended civil complaint, as it

21    is entitled; is that correct?

22        A    My attorney filed, yes.

23        Q    That your attorney filed on your behalf?

24        A    My behalf.

25        Q    And of course, Mr. Kaczmorski, but we know

1  front of you, but I want to show you another document

2  here.

3            This is going to be No. 18.

4            (Thereupon, Cupelli deposition Exhibit

5       No. 18 was marked for identification.)

6  BY MR. McGRAW:

7       Q     This memo was provided to Controller Wagner

8  by, as you can see, Guy Tumolo, who was then Deputy

9  Controller, and it is dated November 29, 2011.  That

10  is about two weeks after the meeting that we discussed

11  earlier, with -- that you had with J.J. Abbott and

12  Martin Schmotzer; is that correct?  November 29th,

13  give or take, about two weeks later?

14       A     Yes.

15       Q     Okay.

16            I am not going to read it again verbatim, I

17  will represent to you that, generally, it discusses

18  budgetary implications of personnel decisions; you can

19  certainly take time and read it, if you like.

20            I would like to refer you, however, to the

21  second page.  The entire second page reads:  "The

22  budget before Council is based on a one mill increase

23  in real estate tax.  If the final budget does not

24  result in as much of an increase in appropriation, or

25  you wish to make some personnel changes, the following

1   positions were viewed as being part of the

2   Controller's immediate staff."

3          And it lists Communication Director

4   Pam Goldsmith, Administrative Assistant Randall

5   Hermann, Conflict Resolution Officer Terry Matuszak,

6   Real Tax Investigator Carmen Cupelli.

7          "With these options, you have the

8   flexibility to establish your own organization.

9   Another option is to create a new job title that is

10   more suitable to your organization and fund it from

11   the available appropriation."

12          Now, would you agree with Mr. Tumolo's

13   characterization of you as being part of Controller

14   Flaherty's immediate staff?

15      A      No.

16      Q      You were not part of his immediate staff?

17      A      No, I wasn't.

18      Q      You had testified earlier, and have

19   testified rather extensively, that you performed

20   pretty much whatever task they needed you to

21   perform --

22      A      Right.

23      Q      -- at the direction of the Controller; is

24   that an accurate depiction of your job?

25      A      Yes.

1       Q       Okay.  But you would not characterize

2    yourself as being part of Mr. Flaherty's immediate

3    staff?

4       A       Correct.

5       Q       Okay.

6               MR. McGRAW:  What number was I on; was that

7       18?  We will call this No. 19.

8               (Thereupon, Cupelli deposition Exhibit

9       No. 18 was marked for identification.)

10   BY MR. McGRAW:

11      Q       This is a memo from March 22nd, 2000, to a

12   Karen Evans, who is identified as being human

13   resources.

14              Was that Karen Evans' position at that

15   time, human resources, or was she a human resources

16   director; do you recall what Karen's position was?

17      A       May be human resource director for

18   Allegheny County, not for our office.

19      Q       I see.  For the county.  Okay.

20              It says that it's from Dorry Lang, from the

21   Controller's Office.

22              Do you know Dorry Lang?

23      A       I can't put the face together, to this

24   name.

25      Q       So you don't remember exactly what

1   Dorry Lang's position was in the Controller's Office?

2       A    No.

3       Q    The memo is short, it reads, "Effective

4   February 28, 2000 Carmen Cupelli was transferred to a

5   different job within the Controller's Office.  I would

6   appreciate it if you would discontinue taking out the

7   deduction for union dues.  If you need additional

8   information, please feel free to contact me at

9   extension 6997.  Thank you for your attention to this

10  matter."

11            And there is a cc: to Chris Carragher,

12  payroll manager.

13            Did I read that correctly?

14      A    Yes.

15      Q    Does this memo reference the switch of

16  position that you described after you left payroll, or

17  payments, and moved into your -- I guess we haven't

18  given it a specific title, but your new job, your

19  other job in the Controller's Office?

20      A    I -- I left payroll, as a payroll clerk, to

21  do those, whatever assignments were.

22      Q    That's what I'm saying, do you take this

23  memo to be that's when you left; correct?  Is it not

24  ten years after you told us you started in 1990, this

25  is March 2000, is that what this is, around that time?

1      A      Yes, around ten years later.

2      Q      And the memo doesn't give your new job

3   title; does it; it just says transferred to a

4   different job within the Controller's Office?

5      A      No.

6      Q      Is that accurate?

7      A      Yes.

8      Q      It does say that you are no longer to pay

9   union dues.  Were you then not a member of the union

10  any more, when you transferred to this new job?

11     A      Yes.

12     Q      But you had been in the union when you

13  worked in payments, or payroll; right?

14     A      Correct.  Yes.

15            MR. McGRAW:  This is going to be

16     Exhibit 20.

17            (Thereupon, Cupelli deposition Exhibit

18     No. 20 was marked for identification.)

19  BY MR. McGRAW:

20     Q      This form is called the "County of

21  Allegheny Row Office & Court of Common Pleas

22  Employment Status Form."

23            This, again, was from your personnel file.

24            At the bottom it is called a master

25  employee status form.  And it says, "Controller -

```
 1   Payroll Division," which was the division that you

 2   were in initially, in the Controller's Office;

 3   correct?

 4        A     Yes.

 5        Q     Do you recognize this form?

 6        A     I don't recall this.

 7        Q     Okay.

 8        A     It is dated down next to the signature that

 9   we see, March 7, 2000; correct?  In the dated box?

10        A     Yes.

11        Q     The form indicates a change for present

12   employee in that second box down.  And the changes are

13   checked as pay, an X in that box, and position, with

14   an X in that box; do you see that; what I'm

15   referencing in the second box down, the two X's?

16        A     Change of position, is that what we are

17   looking for, pay and position?

18        Q     Yes, there is a box checked, yeah, there is

19   a X in for pay, and X for position; do you see those?

20        A     Yes.

21        Q     Okay.

22              You go down to the next big box in.

23        A     Okay.

24        Q     There is at the bottom of that one, it says

25   "Position Title Fiscal Clerk;" that was correct for
```

1  your position at the time, wasn't it, you were a

2  clerk?

3      A      I was a payroll clerk, as I knew it.

4  Okay.

5      Q      The next box, which is box 2A, shows a

6  change, or correction and down towards the bottom of

7  that box, and there is position title, it says "Field

8  Supervisor;" do you see that?

9      A      Yes.

10     Q      Is that correct, is that the change in

11  position that you were making in March of 2000?

12     A      Yes.

13     Q      Also reflects your monthly salary changing

14  from $2,144 per month to $3,166.67 per month; is that

15  correct?

16     A      Yes.

17     Q      So is your position at that time called

18  field supervisor, and not real estate tax

19  investigator?

20     A      I don't recall that, the titles.

21     Q      Did you have a supervisory role then, at

22  that time?

23     A      I don't remember that.

24     Q      Okay.

25            You don't remember supervising anyone,

1   or --

2       A       I never supervising anyone.

3       Q       Okay.

4               MR. McGRAW:  I will make this No. 21.

5               (Thereupon, Cupelli deposition Exhibit

6           No. 21 was marked for identification.)

7               MR. McGRAW:  Christine.

8   BY MR. McGRAW:

9       Q       This is something called a payroll action

10  form, and it shows an effective date of October 3rd,

11  2004.

12              This again from your personnel file.

13      A       Okay.

14      Q       This one to me looks like this is a pay

15  raise, and in that budget justification, just below

16  the middle of the page, it says "Increase in Maximum

17  Salary," so it looks like in October of '04, you got a

18  pay raise; does that sound right?

19      A       Okay.  Yes.

20      Q       Under "Position Title," which is a little

21  closer to the top, in the "Current Status" box, it

22  again says "Field SUPV," I think that's abbreviated

23  for field supervisor; is that correct?

24      A       I don't see that.

25      Q       It's second box down, "Current Status," it

1    says at the top, in about the middle of that box, it

2    says "Field Supervisor," in bold type.

3             Up a little bit from where you are looking

4    there, go straight up.

5        A    Oh.

6        Q    Have you got that?

7        A    Yes.

8        Q    Okay.

9             MR. McGRAW:  This will be No. 22.

10            (Thereupon, Cupelli deposition Exhibit

11       No. 22 was marked for identification.)

12   BY MR. McGRAW:

13       Q    This is another payroll action Form, this

14   time dated December 23rd -- or, I beg your pardon,

15   this one was dated -- did I just show you the wrong

16   one, did I show the same one twice?

17            Oh, no.  Okay.  This one is dated December

18   of '07, I'm sorry, I am getting myself in the wrong

19   place.

20            Do you see where it's dated December 23rd,

21   '07 --

22       A    Yes.

23       Q    -- effective date?

24            This is one, we actually have an attachment

25   on this one, the second page, this looks like another

1    pay raise, in fact, budget justification is given as

2    merit raise; do you see that?

3              On that second page, we see where you

4    were -- one, two, three -- I think the fifth person

5    down?

6         A    Yes.

7         Q    And your job title again is listed as field

8    supervisor; do you see that?

9         A    Yes.

10             MR. McGRAW:  Here is the 2011 one, this

11        will be Exhibit 23.

12             (Thereupon, Cupelli deposition Exhibit

13        No. 23 was marked for identification.)

14   BY MR. McGRAW:

15        Q    This one is the one from July of

16   2011.  July of 2011, was a couple of months after

17   Miss Wagner won the Democratic primary for County

18   Controller; is that correct?

19        A    No, she won the election in November.

20        Q    Well, I'm saying, the Democratic primary,

21   would have been in May 2011?

22        A    Yes.

23        Q    But it was before the general election; is

24   that right?

25        A    Yes.

1      Q      Okay.

2             This one appears to give you another pay

3  increase, it says "Budget Justification, 3 Percent

4  Merit Increase," this one also lists -- in that

5  current status box towards the top that we saw before,

6  lists a different position title for you this time, it

7  says "Real Estate Tax Investigator;" do you see that?

8      A      Yes.

9      Q      Would you agree with me that the first time

10  that the payroll documentation reflects that your job

11  title is real estate tax investigator -- or rather,

12  field supervisor, is a few months after Chelsa Wagner

13  won the primary, and a few months before the general

14  election?

15     A      I don't have any answers to that.

16            We hired Art Victor, that was our -- an

17  assistant deputy, to which every day they were

18  changing titles.

19     Q      Okay.

20     A      So, even though we did the same work, as

21  the same others, we really didn't know what --

22     Q      Well, we went through sequentially, I will

23  represent to you, all of the payroll forms --

24     A      Okay.

25     Q      -- that I found in your personnel file.

1     A     Yeah.

2     Q     This is the first one that references real

3   estate tax investigator, that we -- that you and I

4   just went through here; is that correct?

5     A     Yes.

6     Q     Okay.

7           MR. McGRAW:  This should be Exhibit No. 24.

8           (Thereupon, Cupelli deposition Exhibit

9     No. 24 was marked for identification.)

10   BY MR. McGRAW:

11     Q     This is yet another item from your

12   personnel file, Mr. Cupelli.

13           Do you recall receiving a performance

14   evaluation in what we see here is dated June 15th,

15   2011; do you recall seeing this before?

16     A     We had some conversation, I remember having

17   a conversation with Stanley, and briefly conversation

18   about this.

19     Q     So you have seen this document before?

20     A     You know, I -- probably I have, yes.

21     Q     Okay.

22     A     Not this particular document, but I was

23   aware of this.

24     Q     Did you receive written evaluations like

25   this regularly?

1   Kaczmorski and Cupelli with significantly younger

2   individuals."

3           And paragraph 27 reads, "Defendants also

4   discharged at least six other employees over the age

5   of 50."

6           I asked you this earlier, but again, you

7   identified Mr. Asturi, you cannot identify by name any

8   of those other individuals; correct?

9       A    At that time I had a list of names.  I no

10  longer have that.

11          So, it's hard for me.

12      Q    Okay.

13          Moving down to paragraph 29, it reads,

14  "Defendants replaced Kaczmorski and Cupelli with

15  individuals who actively supported Wagner during her

16  2011 campaign for Controller."

17          Can you identify which public supporter

18  of Miss Wagner replaced you as real estate tax

19  investigator?

20      A    Well, we knew at the time it was the

21  Joe Asturi was the support of the Controller, was

22  doing fundraisers for her, was doing all of the work

23  that was required for a campaign.

24      Q    Okay.

25      A    We knew that to be fact at the time.

1       Q       So you knew Joe Asturi had been a

2   supporter?

3       A       Yes.

4       Q       Paragraph 30 reads, "Kaczmorski and Cupelli

5   were not known supporters of Wagner during her 2011

6   campaign for Controller."

7               How would one become a known supporter of

8   Miss Wagner, or any political candidate, for

9   Controller?

10      A       Well, they have a petition drive, to which

11  you sign the petition supporting others.  And

12  technically, that's how they get around to -- plus we

13  had affairs, where all of the politicians gather, and

14  others, so you tend to know who supporting who for

15  what.

16      Q       So, at those affairs, then, if someone

17  attended one of them, that was a public declaration of

18  their support for that candidate, I suppose; is that

19  what you mean?

20      A       Sure.  If you were in an affair, and

21  someone says, "Sign the petition for Chelsa Wagner for

22  Controller," and you don't sign it, obviously, it is

23  that you were not a supporter of her.

24      Q       Were you a publicly known supporter of any

25  other candidate for Controller?

1      A      We didn't support anyone, because

2   Mark Flaherty wanted us to stay away from the

3   political area, since he was running for county

4   executive.

5      Q      Were you known to oppose Chelsa Wagner's

6   candidacy for Controller?

7      A      I don't know if it was known or not known

8   at the time.  I mean, I have tended to support

9   George Matta, but I didn't make a deal out of it right

10  in the open.

11     Q      So you wouldn't characterize yourself as a

12  known supporter of Joe Matta; you didn't work on

13  George Matta's campaign?

14     A      No, I did not.

15     Q      Did you attend any of George Matta's

16  campaign events?

17     A      No.

18     Q      Did you tell anybody you were supporting

19  George Matta?

20     A      I probably, maybe was known, and I did

21  not -- you know, in the inner circle.

22     Q      You had referenced this actually, but I

23  will read it, it is actually your paragraph 31 of your

24  complaint, it says, "Indeed, the previous Controller,

25  Mark Patrick Flaherty, prohibited employees of the

1    Office of Controller, including Kaczmorski and

2    Cupelli, from publicly supporting any candidates for

3    Controller."

4              So that's the policy you were talking

5    about, that --

6         A    Right.

7         Q    -- Mark Flaherty had, that you weren't

8    allowed to actively --

9         A    Well, we were allowed to do things, as long

10   as we were doing the work hours, he preferred we do

11   nothing at all.

12        Q    Okay.  So he preferred you do not?

13        A    Nothing at all.

14             He had no control over us in the evening

15   hours, or on your own time.

16        Q    Okay.  Did anybody who worked with you in

17   the Controller's Office before Miss Wagner was

18   elected, did any of those people, that you know of,

19   break Mr. Flaherty's rule, and publicly support one

20   candidate for Controller over the other?

21        A    I don't know that.

22        Q    Okay.

23             To your knowledge, are there still

24   individuals employed in the Controller's Office, who

25   were employed there prior to Miss Wagner becoming

1    Controller?  Are there any employees left there, that

2    were there when you were there?

3        A       In the office, on the first floor, where

4    her office is located, the only person as I

5    understand, from testimony in here, that is

6    Rita Martini.  All of the others, she replaced every

7    one of them.

8        Q       Well, any employees generally, do you know

9    if --

10       A       Well, there is a hundred employees in our

11   office, I am sure she didn't replace a hundred

12   employees.

13       Q       To your knowledge, she kept a pretty fair

14   amount of them, then?

15       A       Well, she kept all employees away from the

16   inner circle, where she was on the -- in her office.

17       Q       Did Miss Wagner ever ask you to support

18   her, or to publicly support her, during her campaign?

19       A       No, she did not.

20       Q       Okay.  Did you ever speak with her, during

21   the course of her campaign for Controller?

22       A       Probably say hello in the affairs, and

23   nothing more than that.

24       Q       Did you ever feel compelled to explain to

25   Miss Wagner why you did not publicly support her, and

1   it was because of this policy that Mr. Flaherty had?

2   Did you ever go up to Chelsa, and feel you had to give

3   her that explanation, as to why you weren't a public

4   supporter of her?

5       A     No, we never give explanation to anyone.

6       Q     She didn't ask you for that explanation?

7       A     She didn't ask, and we didn't give it.

8       Q     The next page of your complaint,

9   paragraph 33, says, "However, Defendants paid the

10  employees who replaced Kaczmorski and Cupelli higher

11  salaries."

12          Do you know -- I guess you said the person

13  who replaced you was this Joe Asturi, do you know what

14  Mr. Asturi makes; what his salary is?

15      A     I don't.

16      Q     Do you know the salaries of any of these

17  other replacement employees that you referenced?

18      A     I don't.

19      Q     Okay.

20          Just a couple of more things for you,

21  Mr. Cupelli.

22          This is going to be -- where am I at

23  here -- 25.   Exhibit No. 25.

24          (Thereupon, Cupelli deposition Exhibit

25          No. 25 was marked for identification.)

1     Q      This is another form from your personnel

2     file, it is called at the top here, called a special

3     payment form, and it shows a calculation of total

4     hours for vacation, and personal days, and it

5     calculates about half way down the page this number

6     $4,818.82, and that number is transcribed into a box

7     at the bottom that says, "Total payment, $4,818.82;"

8     is that, as I read the form?

9     A      Yes.

10    Q      Okay.

11           The second page is called a payroll

12    voucher, the Controller of Allegheny County, it shows

13    the same amount, these two calculations total

14    $4,818.82.  Were you paid that amount, after you were

15    laid off, for your vacation and personal days?

16    A      I was paid my personal days.  I don't know

17    if they were paid once, she was sworn in, or it was

18    prior to, but I was paid.

19    Q      Okay.  You did receive this payment,

20    though?

21    A      Yes.

22    Q      Okay.

23    A      It says I received it, I received it.

24    Q      Okay.

25           MR. McGRAW:  And this is going to be

1        No. 26.

2                (Thereupon, Cupelli deposition Exhibit

3        No. 26 was marked for identification.)

4    BY MR. McGRAW:

5        Q       These are some more documents that I found

6    in your personnel file, these are with regard to your

7    pension.

8                This first one that we see here, is an

9    e-mail, it says, it is to Linda Piso, from a

10   Barbara Bateman, from November 20th, 2012.

11               It says:

12               "Linda,

13               "We had sent notification to Mr. Cupelli

14   several times.  The last time was the statement dated

15   6/28/12 informing him that if he did not complete his

16   retirement papers we would no longer go retroactive to

17   his date of retirement.  He finally completed his

18   retirement papers July 11, 2012.  His first check was

19   August 23rd, 2012 in the amount of $15,279.62

20   gross.  His monthly pension $1,925.48.

21               "Let me know if I can be of further

22   assistance.

23               "Barb."

24               Why did you not complete your retirement

25   papers timely, as these two seem to be referencing, in

1    order to obtain your pension?

2         A      The reason why is that I was trying to get

3    back into somewhere in the county.

4         Q      Okay.

5         A      And I didn't want to take my pension out.

6         Q      Okay.

7         A      To pay back.

8         Q      So you didn't want to actually apply for

9    the pension?

10        A      The pension, until it was clear, that --

11        Q      Okay.

12               The second page of the document I handed

13   you, it appears to actually be that June 28, 2012

14   statement, that these two referenced in that previous

15   e-mail that we just looked at.

16               Did you receive this statement?

17               Do you recall receiving it?

18        A      I don't recall, but I'm sure I did.

19        Q      Okay.

20               It read that, "Dear Mr. Cupelli:

21               "As of John 3rd, 2012, at age 67 you were

22   eligible to begin receiving monthly benefits.  As of

23   today, you have not signed your retirement papers.  We

24   have for the second time sent the forms for you to

25   complete.  These forms need to be returned to the

1    Retirement Board to begin to receiving the benefits.

2            "If you wish to collect your pension at a

3    later date, we would appreciate it if you would

4    complete the information below; have it notarized and

5    sent to the Retirement Office.  In choosing in

6    delaying the signing of your papers, your retirement

7    will not be calculated retroactively to your last day

8    of employment.  Your retirement date will be the day

9    you choose to sign and return your papers."

10           Did I read that correctly?

11   A      Yes.

12   Q      Did you eventually respond to this notice?

13   A      Yes.

14   Q      Okay.  If we look at this third page it

15   says, "Retirement Board of Allegheny County,

16   Retirement Quotation," and so far as I can tell, it

17   appears to be exactly that, it calculates total

18   without survivor option, of this number that we saw

19   previously, $1,925.48.

20           There are some notes at the bottom, we

21   don't see who they are from.  It says, "Called and

22   left message August 10, 10:22 and 12:13."  I take

23   those to be times of day.

24           Do you recall having received phone

25   messages from the Controller's Office, or from the

1   county retirement office, attempting to get you to

2   sign those papers?

3        A     I don't recall specifically, but at some

4   point I did sign the papers, because I did get my

5   pension.

6        Q     Okay.  Ultimately you did get your pension?

7        A     I did get my pension.

8        Q     Is that accurate, is your pension in the

9   amount of $1,925.48 per month, right now?

10       A     Yes.  That's correct.

11             MR. McGRAW:  I think that that is all of

12       the questions I have for now.  Thank you,

13       Mr. Cupelli.

14             MS. ELZER:  Okay.  I have just a few, do

15       you -- should I just continue right now?  I see

16       you are being passed a note.  So I don't know.

17             MR. McGRAW:  You can go right ahead, and I

18       will ask a few, if they are --

19             MS. ELZER:  Okay.

20                        EXAMINATION

21   BY MS. ELZER:

22       Q     Okay.  Carmen, I just -- I first wanted to

23   go over the kind of hierarchy, or chain of command,

24   make sure we have that clear.

25             I believe you testified that you report

1   to -- you reported to Stan Kaczmorski; is that right?

2        A      Yes.

3        Q      Okay.  And who did Stan Kaczmorski report

4   to?

5        A      Art Victor.

6        Q      Okay.

7        A      He was hired, some point, Kaczmorski would

8   report to him, so did I, all of us.

9        Q      Okay.  And then do you know who Art Victor

10   reported to?

11        A      That, if I am not mistaken, directly to

12   Frank -- not to Frank Luchino -- directly to

13   Mark Flaherty.

14        Q      Okay.

15               Did you have any reporting relationship to

16   Guy Tumolo?

17        A      We had little.

18        Q      What was his position?

19        A      The deputy.

20        Q      So was he immediately below Mr. Flaherty?

21        A      Yes.

22        Q      Okay.

23               All right.  And in your position, whether

24   it was real estate tax investigator, or whether it was

25   field supervisor, did you have any responsibility for

1      A      Yes.

2      Q      Where do you live?

3      A      Right now, Wilkins Township.

4      Q      In Wilkins Township.  Have you always lived

5  in that Wilkins Township?

6      A      No, McKees Rocks.

7      Q      Oh, you were from McKees Rocks originally?

8      A      Yes.

9      Q      Are you a life-long Allegheny County

10  resident?

11      A      Yes.

12      Q      Okay.  We talked a little bit earlier,

13  about that you were telling me about that rental car

14  versus purchasing the cars, the fleet department

15  issue.

16      A      Right.

17      Q      I just wanted to clarify, the collection of

18  rental car taxes, was not related to that project;

19  correct?

20      A      No.

21      Q      That was -- okay.  Okay.  That's one of the

22  things that you characterize as a special project.

23          Were most of these special projects that

24  you performed one time things, or did you perform any

25  of them, the same project, or similar project, over

1   and over again?

2       A       No.  One time, two times, depended on the

3   situation.

4               They needed something done, they wanted to

5   look at the piece of property at the airport, and the

6   county garage, or those things, they were one time

7   project that I used to go and speak to the people,

8   know who to speak to and get the answer, and come back

9   with the answers.

10      Q       So something like the car rental, or the

11  car purchasing thing, that would have been more of a

12  one time project then?

13      A       That was one time, because they didn't like

14  the answers.

15      Q       Fair enough.

16              They didn't want to hear it again, I guess;

17  huh?

18              The only other thing I wanted to ask you

19  about --

20      A       How about that.

21      Q       -- we of course touched on, and talked a

22  little bit about what was in your complaint, about

23  support of Chelsa Wagner's campaign, or nonsupport of

24  Miss Wagner's campaign for Controller's Office, was

25  there anything said to you, whether it was from

1    Miss Wagner, or anybody else, anything said to you

2    that indicated that your termination was as a result

3    of your not having supported Miss Wagner's campaign?

4         A    I received the letter even before she was

5    sworn in.  That's all I can tell you.

6         Q    She had won the election then; right?

7         A    She had won the election, but she's not

8    sworn in.  She had no knowledge of the things I did,

9    or not.

10            My position was, I worked with three

11   Controllers for 21 years, always done a good job,

12   always been dependable, and hard-working for these

13   people, and Controller Wagner chose to not to retain

14   me, and I received a letter, that we all have, what,

15   in December.

16        Q    Do you think Controller Wagner knew who you

17   were, prior to taking office?

18        A    Sure.

19        Q    Okay.

20            What made you believe, that once you

21   received the letter, how did you come to the belief

22   that it must be because you didn't support her, or

23   didn't publicly support her for the office of

24   Controller?

25        A    Because we were never -- I was never given

1   the opportunity to really talk to her, in the things

2   that I had done.

3          I know she said that I was never send,

4   that's true, but I also was in the Controller's Office

5   21 years, and I also worked for Frank Luchino, that

6   she claims was the best Controller that Allegheny

7   County has, or ever had, so if I was there with

8   Frank Luchino for 13 years, we were never given, you

9   know, it came she had predecided and prejudged, and

10   let us go.

11     Q    So no one ever told you that you were being

12   let go because you failed to support Controller

13   Wagner?

14     A    No.

15     Q    And Controller Wagner didn't say anything

16   like that to you?

17     A    No, she did not.

18     Q    Is there any other reason that you believe

19   this was a political retaliation, anything else you

20   heard, or said, or saw?

21     A    Well, I was a supporter of Dan Onorato at

22   that time that Jack Wagner run for the state senate,

23   that had the big feud, that really -- and I know that

24   was known facts, around politics, that Onorato and

25   Wagner had, and I was a big time supporter of Onorato.

1      Q      Mr. Onorato did not run against Mr. Wagner

2  for the state senate.

3      A      For the senate, he did.

4      Q      I believe, are you talking about --

5      A      For the senate, four years ago.

6      Q      -- governor or senator?

7      A      Senator.

8      Q      Okay.

9             Was there any reference made to that

10  campaign, to you, then, when you were let go?

11     A      No.

12     Q      Is there any other reason, or anything else

13  that led you to the belief, then, that it must have

14  been because of your support for Onorato?

15     A      The only reason make me believe, is we were

16  never given the opportunity to keep us.

17     Q      All right.

18     A      To keep.  After 21 years, I was never given

19  the opportunity to keep me.  Never said, "Let's" -- "I

20  want you to do this job," and I refuse, "I want you to

21  do that," and I said, "No."

22            You know.

23     Q      Okay.

24            MR. McGRAW:  I have no further questions.

25            MS. ELZER:  Okay.  I have a couple for

1        follow up.

2                        EXAMINATION

3     BY MS. ELZER:

4        Q      Carmen, I am going to show you the

5     complaint that was marked as Exhibit 17, I will just

6     give you my copy.

7               And if you look at paragraph 20, this is

8     about Mr. Kaczmorski, but it says, "During Wagner's

9     interview with Kaczmorski, she told him that she was

10    very loyal to her people."

11              Do you see that?

12       A      Yes.

13       Q      Did Miss Wagner make any similar comment

14    like that to you?

15       A      Exactly, the same comment.

16       Q      Okay.  When did she say that?

17       A      When, that was the only time we met with

18    her, in the office, that we had a little interview

19    with her.

20       Q      Would that have been --

21       A      Sometime in December.

22       Q      Of 2011?

23       A      20 -- yes, once --

24       Q      Go ahead.

25       A      Once she won the election, she interviewed